**OYSTER CREEK FINANCIAL CORP,**
**Alfred Antonini, Trustee and U.S. Trust**
**Company of Texas, N.A., Appellants,**

v.

**RICHWOOD INVESTMENTS II,**
**INC. and Sarah Powers,**
**Trustee, Appellees.**

No. 07–96–0347–CV.

Court of Appeals of Texas,
Amarillo.

Dec. 1, 1997.

Rehearing Overruled Jan. 21, 1998.

Gary L. McConnell, Angleton, for appellants.

Barry A. Brown, James T. Liston, Houston, for appellees.

Before BOYD, C.J., and DODSON and REAVIS, JJ.

REAVIS, Justice.

Appellants, Oyster Creek Financial Corporation (Oyster Creek) and Alfred Antonini, individually and as Trustee, (Antonini), appeal from a judgment on jury findings decreeing that they take nothing on their action against the appellees, Richwood Investments II, Inc. (Richwood), and Sarah Powers, trustee, (Powers), and ordering that Richwood recover $567,477.15 together with post judgment interest in the amount of $244.28 per day against Alfred Antonini, Trustee, but not against Antonini individually, or Oyster Creek. Based upon the authorities cited and the rationale expressed herein, we will affirm in part and reverse and remand in part.

This appeal originated as a dispute between the maker of a promissory note (Antonini), and a subsequent holder (Richwood), over the amount of interest and attorney's fees owing on the note. Because the events producing the litigation are both complex, and controlling of the legal questions presented, a proper disposition of the appeal requires an extensive historical review.

On June 17, 1988, Antonini borrowed $900,000.00 from Columbia Savings & Loan Association (Columbia), for the purchase and renovation of a 256 unit apartment complex in Brazoria County, Texas. In connection with the loan, Antonini executed and delivered a $900,000.00 promissory note dated June 17, 1988, payable to Columbia, together with a deed of trust and a security agreement covering the apartments.

The note provided for the payment of interest at a variable rate, as opposed to a fixed rate, and provided for quarterly "interest only" payments for the first two years.[1] Commencing July 16, 1990, the principal and interest became payable in monthly installments on the 16th day of each month until

June 16, 1993, when the entire amount then unpaid became due.

Before the note was paid in full, Columbia failed. Following its demise, the note and deed of trust were assigned by the Resolution Trust Corporation to Bank of America National Trust & Savings Association (Bank of America) as bond trustee. In February 1994, Bank of America in turn engaged BEI Management, Inc. (BEI), its asset management company, to act as debt servicer of the note.

In October 1991, Antonini ceased making payments on the note, placing it in default. Antonini remained in default on the note for over two years.[2] In March 1994, BEI's asset manager, Anthony Felker, began inquiring into the note's payment status, repayment prospects, and the condition of the apartments (the collateral). In response to Felker's inquiries, and in order to improve his own prospects of purchasing back his note for pennies on the dollar, in April 1994, Antonini began "devaluing" the note by informing Felker that the apartments were in bad condition, the taxes had not been paid, and that he, Antonini, was broke and near judgment proof.

Previously, in March 1993, Elaine Knight, the president of Richwood, offered to buy the apartments from Antonini for $1.6 million, but he refused the proposal. In early 1994 however, when Knight learned the apartments were subject to foreclosure, she contacted Felker, the asset manager for BEI, to explore the possibilities of Richwood acquiring the apartments by purchasing the note and deed of trust. On March 22, 1994, Felker offered to sell the note to Richwood for $1.17 million but Richwood declined to purchase it for that price at that time.

In December 1993, Antonini sold the apartments to James Lomonico as trustee for $3.7 million and in May 1994, Lomonico sold the apartments for $3.72 million to Oyster Creek, a corporation owned in part by An-

---

1. The rate of interest provided for in the note was initially set at two percent above the prime rate charged by Chemical Bank, New York. Beginning June 17, 1990, the interest rate increased to 2.5 percent above prime and it continued to increase annually in one-half percent increments

until it topped-out at 3.5 percent on June 17, 1992.

2. Despite the fact that the note was in default there is no evidence in the record that any holder ever accelerated the note.

tonini. In March 1994, unbeknownst to either BEI or Bank of America, Antonini and Oyster Creek obtained a $5 million loan from Southeast Texas Housing Finance Authority secured by a second lien on the apartments. One million forty thousand dollars of the loan proceeds was held in escrow by the title company to protect the first lienholder (Bank of America), but the proceeds were not paid to Bank of America at that time.

By letter dated July 11, 1994, attorneys for Bank of America gave written notice to Antonini of the default and private foreclosure under the deed of trust. The notice advised Antonini that as of March 31, 1994, the balance owing was $1,233,270.08 which included $890,841.14 principal and $342,428.94 interest, accruing at a per diem of $358.81 and, that private foreclosure under the deed of trust would occur on August 2, 1994. However, on July 14, 1994, before the scheduled date of foreclosure, BEI, as the manager for Bank of America, agreed to sell the note and deed of trust to Richwood for $1.17 million, 95 percent of what BEI deemed to be the face value of the note and the same amount BEI originally offered to sell the note to Richwood for in March of that same year.

In late July 1994, Richwood purchased the note and deed of trust from Bank of America for $1,170,000.00. Among other provisions, the asset sale agreement provided that Richwood acquire "any and all claims able to be assigned" by Bank of America. Richwood thereafter entered into a 25 percent contingency fee agreement with legal counsel to enforce the note and foreclose on the apartments. By letter of July 25, 1994, Richwood's counsel notified Antonini that Richwood had acquired the note and would proceed with private foreclosure on August 2, 1994, as previously noticed by Bank of America.[3] The July 25, 1994 letter to Antonini did not indicate the balance owing as shown in Bank of America's notice of foreclosure to have been incorrect.

On August 1, 1994, one day before the scheduled private foreclosure, Antonini met with Knight, the president of Richwood, and Barry Brown, the attorney engaged by Richwood to foreclose on the note. At the meeting, Antonini offered to purchase the note for $25,000.00 over Richwood's cost but his offer was rejected. Instead, Antonini was presented with an unitemized written demand for $1,637,015.00, a figure which Brown had calculated. When Antonini pointed out that the new demand greatly exceeded the amount previously stated by Bank of America to be owing, Brown stated that BEI and Bank of America had used the wrong post maturity interest rate to calculate the amount owing on the note, but Brown did not present any interest calculations and Antonini declined to tender the new amount claimed to be due.

Because private foreclosure under the deed of trust was scheduled for August 2, 1994, Oyster Creek, Antonini and U.S. Trust Company of Texas, commenced two separate suits seeking a temporary restraining order enjoining the private foreclosure. In the action instituted by U.S. Trust Company of Texas as trustee,[4] Service Title Company, which held $1,040,000.00 in escrow to protect Bank of America as the first lienholder, tendered a check made payable to Richwood in the amount of $1,040,000.00 into the court's registry. On August 2, 1994, the trial court entered a temporary order restraining Richwood from conducting the private foreclosure and, on September 29, 1994, the temporary restraining order was extended by agreement into an injunction pending trial.

These two actions were consolidated by the trial court. By his pleadings, Antonini claimed that because Richwood made an "excessive demand" and charged him a usurious rate of interest, portions of the interest and all the attorney's fees claimed by Richwood to be owing on the note were excused. More specifically, Antonini and Oyster Creek claimed that Richwood charged usurious in-

---

3. Bank of America's notice of foreclosure, which was adopted by Richwood, stated that as of March 31, 1994, the principal owed was $890,-841.14, and the interest was $342,428.94 increasing at a per diem of $358.81.

4. U.S. Trust Company held a second mortgage lien on the apartments as a result of the $5 million loan secured by Antonini through the Southeast Texas Housing Authority.

terest disguised as attorney's fees. Answering the suit, Richwood counterclaimed for principal, interest, and collection related attorney's fees due under the note and, asserting the assigned claims of Bank of America, Richwood also counterclaimed for fraud, fraudulent concealment, negligence, civil conspiracy to defraud a secured creditor, and violation of applicable penal statutes. In its amended pretrial order of June 12, 1995, the trial court severed all parties other than Antonini, Oyster Creek, Powers (the substitute trustee appointed by Richwood to conduct the private foreclosure), and Richwood.

Four days before trial, counsel for Antonini and Oyster Creek caused a subpoena duces tecum to be issued commanding Brown, the attorney for Richwood, to appear at trial and produce his calculations of the principal, interest, and attorney's fees which formed the basis of Richwood's August 1, 1994, demand for $1,637,015.00. On the first day of trial, Richwood filed a verified motion to quash the subpoena duces tecum claiming the calculations were privileged attorney "work product." The motion to quash asserted that the calculations involved Brown's subjective thought processes and, therefore, were sensitive attorney "work product." The handwritten calculations were tendered to the trial court for an in camera review, however, the trial court declined to rule on the motion to quash until the matter presented itself during trial. After the court heard brief arguments by counsel at trial, the court ruled that Brown's calculations were indeed "work product" and granted the motion to quash.

The jury found that: (1) the principal balance owing on the note was $890,841.14, the accrued interest was $419,682.90 which accrued at the rate of $646.28 a day, and Richwood was entitled to 15 percent of the amount of principal and interest owing on the note as attorney's fees, (2) Richwood had not charged Antonini usurious interest, (3) Richwood had charged Antonini $131,052.40 in unreasonable attorney's fees on August 1, 1994, (4) Richwood did not employ a device to conceal usury by charging Antonini additional interest in the form of unreasonable attorney's fees, (5) reasonable fees for Antonini's

attorney were $100,000.00 through trial, $25,-000.00 for an appeal to this court, $7,500.00 for making or responding to a writ of error to the Supreme Court, and an additional $7,500.00 if writ was granted, (6) Antonini did not make an adequate tender to Richwood of the amount due on the note on August 1, 1994, (7) Richwood made an excessive demand for payment from Antonini on August 1, 1994, (8) Antonini did not make a tender to Richwood in an amount demanded by Bank of America prior to the sale of the note to Richwood, (9) Antonini and Oyster Creek failed to comply with the terms of the note, loan agreement, and deed of trust covering the apartments, (10) such failure resulted in foreseeable damages to Bank of America, (11) Antonini and Oyster Creek committed fraud against Bank of America, the prior noteholder, (12) Antonini and Oyster Creek did not engage in a civil conspiracy to defraud Bank of America, and (13) Richwood was entitled to recover nothing as compensation for "lost profits" as a result of the fraud or breach of the note, loan agreement, and deed of trust, because it had suffered zero damages. Based upon these findings, the trial court entered judgment in favor of Richwood.

Antonini and Oyster Creek present twelve points of error attacking the trial court's judgment on the jury's findings. Richwood has responded to these points and presents one cross-point. Addressing these points in logical consecution, we first consider Antonini's and Oyster Creek's ninth point of error. By their ninth point contention, they assert that the trial court abused its discretion when it quashed the subpoena duces tecum and refused to order production of attorney Brown's calculations based upon the "work product" privilege. We agree.

Under Texas law evidence is presumed discoverable, Tex.R. Civ. P. 166b(2)(a); *Loftin v. Martin*, 776 S.W.2d 145, 146 (Tex.1989), and except as otherwise provided, no person has a privilege to refuse to produce any object or writing which has been properly subpoenaed. *See* Tex.R. Civ. Evid. 402 & 501. Although not specifically provided for in the Rules of Evidence, one exception to this rule is that attorney "work prod-

uct" is protected from disclosure by privilege. *See* Tex.R. Civ. P. 166b(3)(a); *West v. Solito*, 563 S.W.2d 240, 243 (Tex.1978).

■ However, because evidence is presumed discoverable, the party resisting discovery (*i.e.* Richwood) bears the burden of establishing the privilege and, therefore, must plead it and present evidence which establishes that the document(s) in question qualify for the privilege as a matter of law. *State v. Lowry*, 802 S.W.2d 669, 671 (Tex. 1991); *Loftin v. Martin*, 776 S.W.2d at 146; *Arkla, Inc. v. Harris*, 846 S.W.2d 623, 629–31 (Tex.App.—Houston [14th Dist.] 1993, no writ).

■ The primary purpose of the "work product" privilege is to shelter the mental impressions, conclusions, and legal theories of the attorney, providing a privileged area within which an attorney can analyze and prepare his case. *Owens–Corning Fiberglas v. Caldwell*, 818 S.W.2d 749, 750 (Tex.1991); *Axelson v. McIlhany*, 798 S.W.2d 550, 554 (Tex.1990). The privilege protects the mental impressions and strategy of the attorney, not the facts of the case. *Hickman v. Taylor*, 329 U.S. 495, 511, 67 S.Ct. 385, 394, 91 L.Ed. 451, 462 (1947). It protects against the disclosure of specific documents, communications, reports, mental impressions, memorandum, conclusions, opinions, or legal theories prepared and assembled in actual **anticipation of litigation**, but it is not an umbrella for protecting materials gathered in the ordinary course of a lawyer's business. *National Tank Co. v. Brotherton*, 851 S.W.2d 193, 200 (Tex.1993). A document is not privileged simply because it was created by an attorney or is contained in an attorney's file. *National Union Fire Ins. Co. v. Valdez*, 863 S.W.2d 458, 460 (Tex.1993).

■ Our Supreme Court has set forth a two-part test to determine whether a document has been prepared in **anticipation of litigation** and is privileged under the "work product" privilege. A document is prepared in actual anticipation of litigation if: (1) a reasonable person would have concluded from the totality of the circumstances that there was a **substantial chance** that litigation would ensue; and (2) the party resisting discovery believed in good faith that there was a substantial chance that litigation would ensue and **prepared the document(s) for the purposes of preparing for such litigation**. *National Tank Co. v. Brotherton*, 851 S.W.2d at 195, (modifying the rule originally stated in *Flores v. Fourth Court of Appeals*, 777 S.W.2d 38, 41 (Tex.1989)).

■ In order for the privilege to apply, preparation for litigation must be the **primary motivating purpose** underlying the creation of the document. *Flores v. Fourth Court of Appeals*, 777 S.W.2d at 41; *Henry P. Roberts Investments v. Kelton*, 881 S.W.2d 952, 955 (Tex.App.—Corpus Christi 1994, no writ). (Emphasis added). A document is not prepared "in anticipation of litigation" if it is in fact prepared for some other purpose. *National Tank Co. v. Brotherton*, 851 S.W.2d at 204. Although there is no set statistical probability by which to define "substantial chance of litigation," it simply means that it is more than a mere abstract possibility or unwarranted fear. *Id.*

■ When a party satisfies the procedural requirements for asserting the work product privilege, and tenders the documents to the trial court for an in camera inspection, the trial court must decide whether the privilege applies. *Marathon Oil Co. v. Moye*, 893 S.W.2d 585, 590 (Tex.App.—Dallas 1994, no writ). The scope of discovery and the admissibility of evidence is principally within the discretion of the trial judge. *Ginsberg v. Fifth Court of Appeals*, 686 S.W.2d 105, 108 (Tex.1985). Therefore, unless there is a clear abuse of discretion, the trial court's ruling should not be disturbed on appeal. *Flores v. Fourth Court of Appeals*, 777 S.W.2d. at 41. A trial court abuses its discretion however, if it denies discovery when no proof of privilege has been provided. *Weisel Enters., Inc. v. Curry*, 718 S.W.2d 56, 58 (Tex.1986); *Salazar v. Coastal Corp.*, 928 S.W.2d 162, 172 (Tex.App.—Houston [14th Dist.] 1996, no writ).

■ As a reviewing court, our job is to conduct our own in camera inspection of the documents in question and consider the record to determine whether the trial court properly applied the law of privilege.

*Barnes v. Whittington,* 751 S.W.2d 493, 495 (Tex.1988); *Marathon Oil Co. v. Moye,* 893 S.W.2d at 590. In this regard, "[a] trial court has no discretion in determining what the law is or applying the law to the facts. Thus a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion...." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). A trial court abuses its discretion when it reaches a decision so arbitrary or unreasonable as to amount to a clear and prejudicial error of law. *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985). "When it is once decided that a trial judge exercising a 'discretionary' authority has but one course to follow and one way to decide then the discretionary power is effectually destroyed and the rule which purports to grant such power is effectively repealed." *Jones v. Strayhorn,* 159 Tex. 421, 321 S.W.2d 290, 295 (1959).

■ We must decide whether the trial court correctly applied the law of "work product" to the documents sought to be discovered. Therefore, under *Walker,* we treat the trial court's decision with limited deference. *See Keene Corp. v. Caldwell,* 840 S.W.2d 715, 718 (Tex.App.—Houston [14th Dist.] 1992, no writ).

■ The trial court considered Richwood's motion to quash the subpoena duces tecum during the examination of attorney Brown. The record reflects that the trial court initially placed the burden on Antonini's and Oyster Creek's counsel by asking him to explain why Brown's calculations were both discoverable and relevant, instead of placing the burden on Richwood, the party seeking exclusion. *See State v. Lowry,* 802 S.W.2d at 671. When Brown eventually presented his claim of privilege, he merely stated his notes contained several alternative scenarios for calculating the interest and "the work product privilege covers matters done in anticipation of litigation, when it is foreseen. The calculations were clearly part of that process." Although counsel for both sides presented argument, no evidence was introduced during the hearing to support Richwood's claim of "work product." At the conclusion of the hearing, the trial court held

Brown's calculations to be "work product" and granted Richwood's motion to quash the subpoena duces tecum. Although Richwood and Brown failed to present any evidence in support of their "work product" claim in either their verified motion, or at the hearing, because the trial court did not rule on the "work product" issue until part-way through trial, we have considered the relevant evidence, which had been received when the court considered the motion to quash, in order to most accurately determine whether the trial court abused its discretion.

When the motion to quash was heard, evidence previously admitted included the following:

(1) The promissory note and deed of trust, which both included provisions that in the event of a monetary default by Antonini, Richwood was required to provide him ten (10) days written notice of such default and an opportunity to cure such default within such ten (10) day period;

(2) the demand letter and notice of private foreclosure, dated July 11, 1994, from Bank of America's attorneys to Antonini, giving notice of private foreclosure on August 2, 1994;

(3) the asset sale agreement dated July 13, 1994, whereby Bank of America assigned the note and deed of trust to Richwood;

(4) the July 25, 1994, letter from Richwood's attorneys advising Antonini that Richwood had acquired the note and deed of trust and intended to proceed with the **private foreclosure** on August 2, 1994, in accordance with the notice given by Bank of America;

(5) the unitemized demand letter dated August 1, 1994, from Brown to Antonini stating that the total amount owing was $1,637,015.00 which included principal, interest, and attorney's fees.

Other evidence previously received included the testimony of Knight, the president of Richwood, that Richwood fully intended to proceed with private foreclosure and that attorney Brown calculated the amount owing on the note before the meeting with Antonini on August 1, 1994. Also, before the hearing on the motion to quash, attorney Brown tes-

tified that he wrote the August 1, 1994, letter and faxed it to Antonini at his request.

Paragraph 3.02 of the deed of trust provides that the beneficiary (noteholder) has an election of remedies between either judicial or non judicial (private) foreclosure. It also provides that an election to proceed with either private or judicial foreclosure is not conclusive, so that either remedy survives the commencement of the other. The note and deed of trust also contain provisions which establish a duty on the part of the noteholder to give the maker of the note ten days written notice of a monetary default and an opportunity to cure.

The July 11, 1994, demand letter to Antonini from Bank of America's attorney stated the principal and interest owing was $1,233,-270.08, but the demand letter of Richwood dated August 1, 1994, stated the balance owing was $1,637,015.00. The August 1, 1994, letter did not include calculations to explain the difference of $403,744.92.[5]

In summary, the evidence before the trial court showed that: (1) Bank of America intended to commence private foreclosure proceedings on August 2, 1994, (2) while the private foreclosure proceedings were in progress, Bank of America sold the note to Richwood for $1,170,000.00, (3) by letter of July 25, 1994, Richwood notified Antonini that Richwood had purchased the note and would "proceed to foreclose the collateral in accordance with the Deed of Trust," as previously noticed, (4) at a meeting on August 1, 1994, Brown told Antonini that the balance owing, including principal, interest and attorney's fees, was $1,637,015.00, and he confirmed that amount by fax on August 1, 1994, and (5) Brown made the handwritten calculations for the purpose of private foreclosure and Richwood always intended to proceed with private foreclosure even after suit was filed.

There being no contradictory evidence, the evidence compels the conclusion that the calculations made by Brown were not made in anticipation of litigation. To the contrary, the calculations were made in furtherance of the private (non judicial) foreclosure and in an effort to collect the amount owing on the note under the threat of private foreclosure the next day. Richwood was required by provisions in both the note and the deed of trust to calculate the amount owing and to provide Antonini an opportunity to cure. At the very least, this required Richwood to present Antonini with a breakdown of the principal and interest owing on the note.

Thus, following *National Tank*, we hold that calculations of principal and interest made by an attorney for his client in an effort to affect private collection of a note under threat of private foreclosure, do not constitute attorney "work product." Consequently, the handwritten calculations which were subject to the subpoena duces tecum were not privileged from production, and the trial court erred in holding them to be "work product."

Under harm analysis, this error requires a reversal. *See* Tex.R.App. P. 44.1(a)(1). In *Mentis v. Barnard*, 870 S.W.2d 14 (Tex. 1994), the Court held that an error in the exclusion of evidence requires reversal if it is both controlling on a material issue and is not cumulative. *Id.* at 16.

As earlier noted, Antonini alleged that Richwood (1) made a charge for usurious interest, (2) demanded unreasonable attorney's fees, and (3) charged unreasonable attorney's fees as a device to collect usurious interest. Clearly, Brown's calculations were controlling and material to Antonini's contentions. Richwood claimed the amount owing was $403,744.92 in excess of the amount recently claimed by the former noteholder. In order to uncover the facts substantiating their claim, Antonini and Oyster Creek had an interest in discovering the source of this discrepancy. The jury was in agreement with one of Antonini's and Oyster Creek's claims when it found Richwood charged unreasonable attorney's fees in the amount of $131,052.40. Had Brown's calculations of interest been before the jury, their findings that Richwood did not charge usurious interest and did not employ a device to conceal usury, would likely have been different.

5. Under the ten day notice provisions of the note and deed of trust, Antonini was entitled to writ-ten notice of monetary default and ten days in which to cure.

Our in camera examination of the handwritten calculations shows that in addition to being controlling and material to the claims of Antonini, the granting of the motion to quash had a harmful effect, particularly because Richwood increased the amount demanded by $403,744.92, and the jury found that Richwood charged Antonini unreasonable attorney's fees. We also note that the question presented is not a ruling on the admissibility of evidence. Here, because the trial court erroneously held the calculations were "work product," Antonini's counsel never had the opportunity to see the calculations, examine attorney Brown regarding the calculations, or offer the calculations into evidence.

Given the harmful effect of the trial court's holding, we sustain Antonini's ninth point of error. Because our disposition of this point mandates a reversal, a discussion of Antonini's remaining points is pretermitted. Tex. R.App. P. 47.1. However, we now turn to Richwood's cross-point.

By it's cross-point, Richwood seeks a reversal and remand solely on it's fraud claim against Antonini. As earlier noted, the jury found that Antonini and Oyster Creek committed fraud upon Bank of America, however it awarded zero damages for Richwood's "lost profits." Richwood now contends the trial court erred in denying it's motion for new trial on the fraud claim because the jury's finding of zero damages is against the great weight and preponderance of the evidence and is manifestly unjust. We disagree.

The decision of a trial court to deny a motion for new trial will not be disturbed on appeal unless there is a showing that it abused its discretion. *Strackbein v. Prewitt*, 671 S.W.2d 37, 38 (Tex.1984).

At trial, Richwood chose to submit its damage claim as a claim for "lost profits," and it does not now claim the question was improperly submitted to the jury. Its only contention on appeal is with regard to the jury's finding of zero damages. Richwood had the burden to establish its damages with a reasonable degree of certainty. *A.B.F. Freight Systems, Inc. v. Austrian Import Service, Inc.*, 798 S.W.2d 606, 615 (Tex.App.—Dallas 1990, writ denied). Moreover, there can be no recovery for damages which are speculative or conjectural; they must be ascertainable by reference to some fairly definite standard, established experience, or direct inference from known facts. *Berry Contracting, Inc. v. Coastal States Petrochemical Co.*, 635 S.W.2d 759, 761 (Tex. App.—Corpus Christi 1982, writ ref'd n.r.e.). Although mathematical precision is not required to establish the extent or amount of one's damages, one must bring forward the best evidence of the damage of which the situation admits, and there must be some basis for reasonable inferences. *Gulf Coast Investment Corp. v. Rothman*, 506 S.W.2d 856, 858 (Tex.1974). Speculative or remote damages may not be recovered. *Westech Engineering, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 205 (Tex.App.—Austin 1992, no writ).

The standard of review of a point challenging the jury finding as being factually insufficient was stated in *In Re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951). Under the rule, this Court can set aside the jury's finding only if we determine that the verdict is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Id* at 661; *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986). A verdict may also be set aside if it shocks the conscience or clearly indicates bias. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex.1986). Although we weigh and review **all** evidence presented at trial when presented with a factual sufficiency point, we may not set aside a jury finding merely because we believe we would have reached a different and more reasonable result had we been jurors. *Jaffe Aircraft Corp. v. Carr*, 867 S.W.2d 27, 28 (Tex.1993). This standard of review is followed whether the challenge for factual insufficiency is against a negative or affirmative jury finding and regardless of who had the burden of proof. *M.J. Sheridan & Son Co. v. Seminole Pipeline Co.*, 731 S.W.2d 620, 623 (Tex.App.—Houston [1st Dist.] 1987, no writ).

Richwood presented no evidence that the **fraud** of Antonini either reduced the value of the collateral securing the promisso-

ry note or placed its first lien status in jeopardy. To the contrary, the evidence establishes that: (1) BEI offered to sell the note to Richwood in March of 1994 for $1.17 million, (2) Antonini did not begin sending BEI fraudulent information about his financial status or the value of the apartments until April of 1994, and (3) in July of 1994, Richwood ultimately paid the $1.17 million initially sought by BEI back in March. Therefore, the evidence actually establishes that Antonini's fraud had no affect on BEI's decision regarding the sale price of the note.

Furthermore, the record reflects that Richwood had not foreclosed on the collateral at the time of trial and did not even seek judicial foreclosure in the action. Therefore, there was no evidence showing that the fraud of Antonini caused any loss or economic damage to Richwood, and any such loss which might occur in the future would be mere speculation and conjecture at this time. Although some evidence does show that Bank of America sold the note to Richwood for less than what Bank of America deemed to be the balance owing, even if the fraud of Antonini caused Bank of America to make its business decision to sell the note for less than the balance owing, Richwood suffered no damages. Instead, quite the contrary, if Antonini's fraud had any affect, Richwood received the benefit of it when it purchased the note for less than the balance owing. The jury's finding of zero damages was therefore not against the great weight and preponderance of the evidence and, consequently, the trial court did not abuse its discretion in denying Richwood's motion for new trial. Richwood's cross-point is overruled.

Accordingly, that portion of the judgment that Richwood take nothing from Antonini and Oyster Creek on its fraud claim is severed from the remaining portions of the judgment, and is affirmed; the remaining portions of the judgment are reversed and remanded to the trial court for a new trial.