NO. 07-00-0319-CV 


IN THE COURT OF APPEALS


FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL B



OCTOBER 17, 2001


______________________________




KING'S COURT RACQUETBALL, LOWELL BLANKFORT and

ROWLAND REBELE,


 Appellants

v.


T.E. DAWKINS,



 Appellee

______________________________
 

FROM THE 251ST DISTRICT COURT OF RANDALL COUNTY;


NO. 43,538-C; HON. PATRICK A. PIRTLE, PRESIDING

______________________________



Before Boyd, C.J., Quinn, and Johnson, JJ.

 King's Court Racquetball, Lowell Blankfort, and Rowland Rebele (collectively
referred to as K.C.) appeal from a final judgment awarding T.E. Dawkins recovery against
them. Four issues are presented for review. They concern the trial court's finding that
K.C. committed waste and the manner by which damages arising therefrom were
calculated. We affirm.




Background

 According to the record, Dawkins and K.C. were competitors in the racquetball
business. Both owned and operated a court. However, the two eventually executed a
lease agreement whereby K.C. agreed to rent Dawkins' facility for approximately three
years. Through the lease, K.C. obligated itself to 1) "use [the facility] as a physical fitness
related club" and 2) keep the premises "free from waste or nuisance and in a clean
condition, and . . . [to] deliver up the premises [at the end of the lease] in a clean and
sanitary condition, reasonable wear and tear . . . excepted." Moreover, Dawkins permitted
K.C. to "make improvements" subject to the prior consent of Dawkins if they involved
"creat[ing] any openings in the roof or exterior walls."

 Before the lease expired, the parties executed a five year extension. Therein, K.C.
was granted permission to use the facility "for any lawful purpose" because the restrictions
as to use contained in the original agreement were "removed in their entirety." So too did
the parties agree that "[a]ll restrictions upon [K.C.'s] alteration and improvement of the
building [were] removed . . . and [that K.C.] shall be permitted to alter, reconstruct, rebuild
and modify the premises without restriction." Dawkins also extended K.C. the authority to
"sublease or assign the Lease or the premises, or any portion thereof, or any interest
therein, for the term of [the] Extension, without consent of Lessor." These rights were
extended to K.C. because the latter told Dawkins it intended to modify the building and
sublease it to others. 

 Upon executing the extension, K.C. obtained an "interior demolition" permit from the
City of Amarillo and proceeded to gut the facility. According to K.C.'s representative,
Dawkins was never told of its intent to demolish the interior. Nevertheless, the racquetball
courts were removed, as were walls, a hot tub, 17 panels of lockers, doors and door
frames, wooden floor covering, a staircase to the second floor, numerous ceiling tiles,
Formica wall covering, bathroom counters, and glass doors. Left was what K.C.
considered a "shell," that is, a hollow edifice with 1) hot electrical wires tangling from the
ceiling and electrical boxes, 2) ceiling tile hangers dangling from the ceiling, 3) perimeter
walls shorn of covering and exposing their framework, 4) water stains appearing on the
brick walls, 5) a bare concrete floor, and 6) a second floor with office space which could
no longer be accessed without a ladder. Moreover, a portion of the materials removed,
such as the walls and the lockers, were installed in K.C.'s own facility without the consent
of Dawkins. Finally, the premises were returned to Dawkins in their gutted condition upon
expiration of the lease. 

 Needless to say, Dawkins sued K.C. for damages. The causes of action alleged
sounded in "breach of contract," waste, conversion, and violation of the Free Enterprise
Act. Upon trial by the court, the latter found that 1) K.C. "removed the existing racquetball
courts to make way for new tenant improvements," 2) K.C. failed to make those
improvements, and 3) the failure to make those improvements constituted waste. 
Consequently, Dawkins was awarded damages representing the "reasonable cost of
repairs to place the leased premises in the condition that the premises would have been
in had the lessee not breached its duty to keep the premises free from waste . . . ." In
conjunction with its issuance of those factual findings, the court also concluded, as a
matter of law, that 1) the "[f]ailure to 'alter, reconstruct, rebuild or modify' the premises so
as to restore the property to a commercially reasonable state of improvement at least
equal to the state of improvement when leased, reasonable wear and tear excepted, was
waste," 2) K.C. breached its duty to "'maintain the leased premises' and to keep [same]
'free from waste or nuisance and in clean condition,'" 3) K.C. breached its duty to "deliver
the premises to the Lessor, at the termination of the lease, in 'good repair and condition,
reasonable wear and tear . . . excepted," 4) K.C. converted personalty of Dawkins, 5) K.C.
was "liable to [Dawkins] for damages occasioned by the failure to deliver the premises to
lessor . . . in 'good repair and condition, reasonable wear and tear . . . excepted,'" and 6)
the "appropriate measure of damages for waste [was] the reasonable cost of repairs to 

[ ] place the premises in the condition that [they] would have been in had the lessee not
breached its duty to keep the premises free from waste."

Issue One -- Waste


 K.C. initially contends that the trial court erred in finding that it committed waste
because its acts were not wrongful. Furthermore, they were not wrongful because the
lease extension agreement permitted it to "alter, reconstruct, rebuild and modify the
premises without restriction." We overrule the contention for several reasons.

 Wrongful Nature of the Conduct

 First, it is clear that to constitute waste, the act allegedly causing it must be
wrongful. R.C. Bowen Est. v. Continental Trailways, 256 S.W.2d 71, 72 (Tex. 1953)
(defining waste as an injury to the reversionary interest in land caused by the wrongful act
of a tenant or other party rightfully in possession). In demolishing the interior of the
building, K.C. converted property owned by Dawkins that was once attached to the
building. That property consisted of lockers and the materials comprising various of the
walls within the building. No one disputes that. Nor can it be disputed that conversion
involves an act deemed unacceptable under the law. Thus, some evidence appears of
record upon which the trial court could have found that K.C. committed a wrongful act
(conversion) resulting in waste.

 Second, the doctrine of waste serves to protect the landowner's reversionary
interest in the property. R.C. Bowen Est. v. Continental Trailways, 256 S.W.2d at 72;
Abraxas Petroleum Corp. v. Hornburg, 20 S.W.3d 741, 753 (Tex. App.--El Paso 2000, no
pet.). It reflects the implicit duty of a tenant to exercise reasonable care to protect the
leased premises from injury other than by ordinary wear and tear. Because the tenant has
such a duty, its breach constitutes waste. Id. Yet, like many others, the obligation to
prevent waste may be affected by contract. See DeWitt County Elec. Coop. v. Parks, 1
S.W.3d 96, 105 (Tex. 1999) (noting that when a contract spells out the parties' respective
rights about whether trees may be cut, the contract and not common-law negligence
theories governs any dispute about whether trees could be cut). So, the terms of the
contract and their meaning become of utmost importance. Next, in construing words, we
must accord them their plain grammatical meaning unless to do so would defeat the
parties' intent. Id. at 101. So too must we read the agreement in a manner furthering the
underlying intent of the parties. Borders v. KRLB, Inc., 727 S.W.2d 357, 359 (Tex. App.--Amarillo 1987, writ ref'd n.r.e.). Finally, the words at issue may not be plucked from their
context and then construed. Rather, they are to be interpreted, to the extent possible, in
a way that gives effect to the entire agreement and harmonizes potential conflict between
differing provisions. MCI Telecomms. Corp. v. Texas Utils. Elec. Co., 995 S.W.2d 647,
652 (Tex. 1999). 

 Here, K.C. asserts that its right to "alter, reconstruct, rebuild and modify the
premises without restriction" entitled it to not only demolish the interior but also leave it in
that demolished state. But, to construe the pertinent words to accord K.C. that right would
violate the foregoing rules of contract interpretation. For instance, the terms "reconstruct"
and "rebuild" are synonymous and mean to build or construct again. Webster's New
World Dictionary, College Edition 1187 (2d ed. 1980). They connote the act of
erecting an edifice, not demolishing it. So, to accord them a meaning synonymous with
destruction, as K.C. persuades us to do, would be to ignore their plain grammatical
meaning. 

 Similarly, the words "alter" and "modify" are synonymous. Each means to change
or make different. Webster's New World Dictionary, College Edition 40 (2d ed. 1980). 
And, though to demolish an object is to change it or make it different, courts have
appended restrictions to the definition when the terms are used in lease agreements. For
instance, in Mayer v. Texas Tire & Rubber Co., 223 S.W. 874 (Tex. Civ. App.--Fort Worth
1920, no writ), the court held that the authority to alter a building did not encompass the
power to implement substantial changes to the edifice which could not be removed at
lease end without injury to the building. Id. at 875. In other words, Mayer recognizes that
the power to alter permits the tenant to make changes, but those changes cannot be
substantial and non-removable. Next, over thirty years prior to Mayer, the court in
Davenport v. Magoon, 4 P. 299 (Or. 1884) concluded that the right to alter a structure did
not include the right to tear it down or destroy it. Id. at 301-302. This was so because "the
idea [was] that the identity of the subject [be] preserved, although the form or nature may
[be] modified or changed." Id. From these two cases we deduce that though a tenant may
be granted the right to alter the premises, that right is not plenary. It is, at the very least, 
limited to doing that which does not destroy, in whole or part, the building without
accompanying repair and reconstruction. (1) Simply put, permission to alter or modify "will
not be valid to the extent that it purports to permit the tenant to commit acts of willful and
wanton destruction of the leased property because no sensible end is achieved by
allowing those acts." Restatement (Second) of Property, §12.2, cmt. (j) (1977). 

 That the words, alter, modify, reconstruct, and rebuild were followed by the phrase
"without restriction" does not change our conclusion. This is so because the intent of the
parties viz-a-viz the agreement remains paramount and controlling. That is, and as
mentioned in the body of the opinion, while words generally will be given their plain
grammatical meaning, that is not true when doing so contradicts the intent of the parties. 
Here, the intent was to convert the building from racquetball courts to retail space available
for sublet, as evinced by 1) granting K.C. the authority to modify and sublet the premises
and 2) relieving K.C. of the prior use restrictions. In other words, the parties clearly 
intended to change the potential uses of the building, to convert it from one viable use to
another. To construe the phrase "without restriction" as authorizing K.C. to obtain
possession of the building, demolish its interior, and return a scarred, empty shell which
has little use while in that state would be to construe the phrase in a way contradicting the
clear intent of the parties. That, we cannot do.

 Moreover, in construing the words alter, modify, and without restriction as we do,
we also harmonize the various provisions within the lease at bar. Indeed, one cannot
rationally say that K.C. fulfilled its contractual duty to "keep [the premises] . . . in clean
condition, and . . . deliver up [same] in a clean and sanitary condition . . . [and] in good
repair and condition" at the end of the lease term if its supposed right to alter allowed it to
gut the edifice and leave a scarred shell. So, in reading the power to alter and modify
"without restriction" to exclude acts which result in substantial change or destruction to the
identity of the premises, we are effectively harmonizing the right to alter with K.C.'s duty
to maintain and return same in a clean condition and good repair.

 Next, to take possession of a building containing racquetball courts, a stairway,
lockers, whirl pool tub, glass doors, and wooden walls (to name a few amenities once
found in the building) and return a gutted shell replete with water stains, missing ceiling
tile, holes in the walls, and no access to its upper levels while stealing portions of the
property removed is to commit acts of willful destruction without accompanying repair or
reconstruction. That K.C. may have been allowed to alter "without restriction" is not
permission to destroy. And, because the destruction brought upon the facility at bar was
not permitted, it was wrongful for purposes of waste.

 No Harm 

 Lastly, and assuming arguendo that the trial court erred in holding that K.C.
committed waste, the finding did not harm K.C. This is so because the tenant was also
found to have breached its duty to "deliver the premises to the Lessor, at the termination
of the lease, in 'good repair and condition . . . .'" So too did the trial court conclude that
K.C. was "liable to the lessor for damages occasioned by the failure to [so] deliver the
premises . . . ." Moreover, the court ultimately measured the damages recoverable by
Dawkins as the "reasonable cost of repairs to [ ] place the premises in the condition that
[they] would have been" but for the breached duty relating to "waste." 

 Given that K.C. attacked on appeal neither the finding of breached duty to return
the structure in good repair and condition nor the conclusion that K.C. was liable to
Dawkins for damages occasioned by the failure to so return the property, both bind this
court and the litigants. And, to the extent that the formula utilized when measuring
damages attributable to a breached duty to return property in good repair is the reasonable
costs of repair or of returning the premises to the obligated condition, see Dunlap v. Mars
Plumbing Supply Co., 504 S.W.2d 917, 918 (Tex. Civ. App.--San Antonio 1973, no writ)
(stating that the damages arising from breaching the duty to return property in good
condition and repair is the cost of repairs to place the edifice in the obligated condition),
Bariod Div., Nat'l Lead Co. v. Early, 390 S.W.2d 866, 868 (Tex. Civ. App.--Eastland 1965,
no writ) (stating the same); Whitworth Estate v. Mangels of Texas, Inc., 363 S.W.2d 851,
858 (Tex. Civ. App.--Waco 1962, no writ) (holding the same), and that was the formula
ultimately utilized by the court, we find no harm. (2) 

Issues Two, Three, and Four


 Through its remaining issues, K.C. attacks the measure of damages utilized by the
trial court. It initially posits that the correct measure was not the cost of repair but the
difference between the value of the property before and after the injury. Then, it urges that
the ultimate award of $333,000 as the cost of repair lacked legally and factually sufficient
evidentiary basis. Finally, resolution of both of these issues purportedly merits reversal,
says K.C. We again disagree and overrule the contentions.

 Appropriate Measure of Damages

 Assuming arguendo that the measure of damages applicable to waste is the
difference in value before and after the injury, it is not viz-a-viz breached duty to repair, as
illustrated above. Again, when attempting to recompense a breached duty to return in
good repair, the measure is the costs of repairing the building or returning it to the
obligated condition. Dunlap v. Mars Plumbing Supply Co., supra; Bariod Div., Nat'l Lead
Co. v. Early, supra; Whitworth Estate v. Mangels of Texas, Inc., supra. And, as was also
discussed above, the trial court found that K.C. breached its duty to return the property in
good repair (a finding K.C. does not dispute on appeal). So, because the measure of
damages is the cost of repair when attempting to recompense a breached duty to repair
and because the trial court ultimately utilized that measure in calculating damages, we
again find that K.C. suffered no harm. 

 In short, the court was entitled to award damages for waste or breach of the duty
to return the property in good repair. The damages eventually awarded comported to
those recoverable for breached duty to return in good repair, irrespective of how the court
characterized them. So, we cannot say that K.C. was harmed.

 Legal and Factual Sufficiency of the Evidence Supporting the Damage Award

 As to the legal and factual sufficiency of the damage award, we apply the standard
discussed in Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co., 766 S.W.2d 264, 275-76
(Tex. App-Amarillo 1988, no writ), and refer the litigants to that case for an explanation of
same. Furthermore, the court found the cost to repair the premises and place it in the
condition it should have been in was $333,000. That amount approximated the sum
derived by multiplying 11,000 by $30. Moreover, the number 11,000 represented the
number of square feet in the building which were affected by K.C.'s demolition efforts,
while the number $30 represented the approximate cost of repairing the premises to the
condition of mid-range retail space. Given this, we hold that there is some evidence of
record supporting the trial court's damage calculation. 

 As to the contention regarding factual insufficiency, we note that Dawkins' expert
was unable to say with certainty what the actual cost of repair would be. Much depended
upon the desires of the tenants which would ultimately rent the building. Thus, he
proposed a range of $30 to $40 dollars a square foot. That amount was far less than the
$450,000 plus it would have cost to repair the building to the state of a racquetball club. 
Moreover, in adopting the low portion of the $30 to $40 range and awarding damages of
$333,000, the trial court implicitly concluded that K.C. did not have to repair the building
to its status as a racquetball club, i.e. repair it to its original identity. Rather, it implicitly
held that the tenant need only have repaired the building to the state of retail space
available for sublet. And, that state was the one contemplated by the parties when they
executed the lease extension. So, in effect, by awarding damages equal to the amount
needed to create retail space available for sublet, the trial court awarded damages equal
to the cost of restoring the edifice to the obligated condition, and, after all, that is the
measure of damages applicable to redressing a breached duty to repair and return the
property in good condition. Dunlap v. Mars Plumbing Supply Co., 504 S.W.2d at 918. 


 Additionally, it is clear that damages need not be established with mathematical
precision. Gulf Coast Inv. Corp. v. Rothman, 506 S.W.2d 856, 858 (Tex. 1974); Oyster
Creek Fin. Corp. v. Richwood Invs. II, Inc., 957 S.W.2d 640, 649 (Tex. App.-Amarillo 1997,
pet denied). Rather, one need only bring forward the best evidence of the damage of
which the situation admits and from which reasonable inferences may be made. Id. Here,
to repair the building to its condition at the time the lease was executed would be to do that
which was never contemplated under the lease. Again, all intended at that time that the
premises would be converted into retail space available for sublet to third-parties. And,
because it was not previously retail space as contemplated by the parties, Dawkins' expert
could only approximate the range of the costs involved in placing the building in the
obligated condition. Admittedly, the actual costs could vary given the dictates of potential
lessees. Yet, the opinion rendered by the expert was based upon his experience in
building "mid-range" retail space. Under these circumstances, the opinion is susceptible
to consideration as the best evidence of the damage and provided basis for the fact-finder
to reasonably infer the cost of repair. Thus, the evidence supporting the trial court's
determination, when tested against the entire record, was not so weak nor was the sum
awarded so contrary to the overwhelming weight of the evidence so as to render the
finding clearly wrong or manifestly unjust. 

 Accordingly, for the reasons stated above, we affirm the judgment of the trial court.


 Brian Quinn

 Justice



Publish
1. Of course, one cannot deny that a land owner may give his tenant the right to destroy or
substantially change the character of the leased premises. We simply hold that such a right is not implicit
in the mere use of the terms "alter" or "modify" or some derivative thereof.
2. K.C. acknowledged in its brief that the reasonable costs of repairs was the measure of damages
used to calculate an award to redress a breached duty to return leased premises in good repair.