NO. 07-00-0319-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

OCTOBER 17, 2001
_____

KING'S COURT RACQUETBALL, LOWELL BLANKFORT and
ROWLAND REBELE,

Appellants

v.

T.E. DAWKINS,

Appellee
_____

FROM THE 251ST DISTRICT COURT OF RANDALL COUNTY;

NO. 43,538-C; HON. PATRICK A. PIRTLE, PRESIDING
_____

Before Boyd, C.J., Quinn, and Johnson, JJ.

King's Court Racquetball, Lowell Blankfort, and Rowland Rebele (collectively referred to as K.C.) appeal from a final judgment awarding T.E. Dawkins recovery against them. Four issues are presented for review. They concern the trial court's finding that K.C. committed waste and the manner by which damages arising therefrom were calculated. We affirm.

1

## *Background*

According to the record, Dawkins and K.C. were competitors in the racquetball business. Both owned and operated a court. However, the two eventually executed a lease agreement whereby K.C. agreed to rent Dawkins' facility for approximately three years. Through the lease, K.C. obligated itself to 1) "use [the facility] as a physical fitness related club" and 2) keep the premises "free from waste or nuisance and in a clean condition, and . . . [to] deliver up the premises [at the end of the lease] in a clean and sanitary condition, reasonable wear and tear . . . excepted." Moreover, Dawkins permitted K.C. to "make improvements" subject to the prior consent of Dawkins if they involved "creat[ing] any openings in the roof or exterior walls."

Before the lease expired, the parties executed a five year extension. Therein, K.C. was granted permission to use the facility "for any lawful purpose" because the restrictions as to use contained in the original agreement were "removed in their entirety." So too did the parties agree that "[a]ll restrictions upon [K.C.'s] alteration and improvement of the building [were] removed . . . and [that K.C.] shall be permitted to alter, reconstruct, rebuild and modify the premises without restriction." Dawkins also extended K.C. the authority to "sublease or assign the Lease or the premises, or any portion thereof, or any interest therein, for the term of [the] Extension, without consent of Lessor." These rights were extended to K.C. because the latter told Dawkins it intended to modify the building and sublease it to others.

Upon executing the extension, K.C. obtained an "interior demolition" permit from the City of Amarillo and proceeded to gut the facility. According to K.C.'s representative,

2

Dawkins was never told of its intent to demolish the interior. Nevertheless, the racquetball courts were removed, as were walls, a hot tub, 17 panels of lockers, doors and door frames, wooden floor covering, a staircase to the second floor, numerous ceiling tiles, Formica wall covering, bathroom counters, and glass doors. Left was what K.C. considered a "shell," that is, a hollow edifice with 1) hot electrical wires tangling from the ceiling and electrical boxes, 2) ceiling tile hangers dangling from the ceiling, 3) perimeter walls shorn of covering and exposing their framework, 4) water stains appearing on the brick walls, 5) a bare concrete floor, and 6) a second floor with office space which could no longer be accessed without a ladder. Moreover, a portion of the materials removed, such as the walls and the lockers, were installed in K.C.'s own facility without the consent of Dawkins. Finally, the premises were returned to Dawkins in their gutted condition upon expiration of the lease.

Needless to say, Dawkins sued K.C. for damages. The causes of action alleged sounded in "breach of contract," waste, conversion, and violation of the Free Enterprise Act. Upon trial by the court, the latter found that 1) K.C. "removed the existing racquetball courts to make way for new tenant improvements," 2) K.C. failed to make those improvements, and 3) the failure to make those improvements constituted waste. Consequently, Dawkins was awarded damages representing the "reasonable cost of repairs to place the leased premises in the condition that the premises would have been in had the lessee not breached its duty to keep the premises free from waste . . . ." In conjunction with its issuance of those factual findings, the court also concluded, as a matter of law, that 1) the "[f]ailure to 'alter, reconstruct, rebuild or modify' the premises so

3

as to restore the property to a commercially reasonable state of improvement at least equal to the state of improvement when leased, reasonable wear and tear excepted, was waste," 2) K.C. breached its duty to "'maintain the leased premises' and to keep [same] 'free from waste or nuisance and in clean condition,'" 3) K.C. breached its duty to "deliver the premises to the Lessor, at the termination of the lease, in 'good repair and condition, reasonable wear and tear . . . excepted,'" 4) K.C. converted personalty of Dawkins, 5) K.C. was "liable to [Dawkins] for damages occasioned by the failure to deliver the premises to lessor . . . in 'good repair and condition, reasonable wear and tear . . . excepted,'" and 6) the "appropriate measure of damages for waste [was] the reasonable cost of repairs to [ ] place the premises in the condition that [they] would have been in had the lessee not breached its duty to keep the premises free from waste."

### *Issue One — Waste*

K.C. initially contends that the trial court erred in finding that it committed waste because its acts were not wrongful. Furthermore, they were not wrongful because the lease extension agreement permitted it to "alter, reconstruct, rebuild and modify the premises without restriction." We overrule the contention for several reasons.

*Wrongful Nature of the Conduct*

First, it is clear that to constitute waste, the act allegedly causing it must be wrongful. *R.C. Bowen Est. v. Continental Trailways*, 256 S.W.2d 71, 72 (Tex. 1953) (defining waste as an injury to the reversionary interest in land caused by *the wrongful act* of a tenant or other party rightfully in possession). In demolishing the interior of the building, K.C. converted property owned by Dawkins that was once attached to the

4

building. That property consisted of lockers and the materials comprising various of the walls within the building. No one disputes that. Nor can it be disputed that conversion involves an act deemed unacceptable under the law. Thus, some evidence appears of record upon which the trial court could have found that K.C. committed a wrongful act (conversion) resulting in waste.

Second, the doctrine of waste serves to protect the landowner's reversionary interest in the property. *R.C. Bowen Est. v. Continental Trailways*, 256 S.W.2d at 72; *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 753 (Tex. App.--El Paso 2000, no pet.). It reflects the implicit duty of a tenant to exercise reasonable care to protect the leased premises from injury other than by ordinary wear and tear. Because the tenant has such a duty, its breach constitutes waste. *Id.* Yet, like many others, the obligation to prevent waste may be affected by contract. *See DeWitt County Elec. Coop. v. Parks*, 1 S.W.3d 96, 105 (Tex. 1999) (noting that when a contract spells out the parties' respective rights about whether trees may be cut, the contract and not common-law negligence theories governs any dispute about whether trees could be cut). So, the terms of the contract and their meaning become of utmost importance. Next, in construing words, we must accord them their plain grammatical meaning unless to do so would defeat the parties' intent. *Id.* at 101. So too must we read the agreement in a manner furthering the underlying intent of the parties. *Borders v. KRLB, Inc.*, 727 S.W.2d 357, 359 (Tex. App.--Amarillo 1987, writ ref'd n.r.e.). Finally, the words at issue may not be plucked from their context and then construed. Rather, they are to be interpreted, to the extent possible, in a way that gives effect to the entire agreement and harmonizes potential conflict between

5

differing provisions. *MCI Telecomms. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2d 647, 652 (Tex. 1999).

Here, K.C. asserts that its right to "alter, reconstruct, rebuild and modify the premises without restriction" entitled it to not only demolish the interior but also leave it in that demolished state. But, to construe the pertinent words to accord K.C. that right would violate the foregoing rules of contract interpretation. For instance, the terms "reconstruct" and "rebuild" are synonymous and mean to build or construct again. WEBSTER'S NEW WORLD DICTIONARY, COLLEGE EDITION 1187 (2d ed. 1980). They connote the act of *erecting* an edifice, not demolishing it. So, to accord them a meaning synonymous with destruction, as K.C. persuades us to do, would be to ignore their plain grammatical meaning.

Similarly, the words "alter" and "modify" are synonymous. Each means to change or make different. WEBSTER'S NEW WORLD DICTIONARY, COLLEGE EDITION 40 (2d ed. 1980). And, though to demolish an object is to change it or make it different, courts have appended restrictions to the definition when the terms are used in lease agreements. For instance, in *Mayer v. Texas Tire & Rubber Co.*, 223 S.W. 874 (Tex. Civ. App.--Fort Worth 1920, no writ), the court held that the authority to alter a building did not encompass the power to implement substantial changes to the edifice which could not be removed at lease end without injury to the building. *Id.* at 875. In other words, *Mayer* recognizes that the power to alter permits the tenant to make changes, but those changes cannot be substantial and non-removable. Next, over thirty years prior to *Mayer*, the court in *Davenport v. Magoon*, 4 P. 299 (Or. 1884) concluded that the right to alter a structure did

6

not include the right to tear it down or destroy it. *Id.* at 301-302. This was so because "the idea [was] that the identity of the subject [be] preserved, although the form or nature may [be] modified or changed." *Id.* From these two cases we deduce that though a tenant may be granted the right to alter the premises, that right is not plenary. It is, at the very least, limited to doing that which does not destroy, in whole or part, the building without accompanying repair and reconstruction.[1] Simply put, permission to alter or modify "will not be valid to the extent that it purports to permit the tenant to commit acts of willful and wanton destruction of the leased property because no sensible end is achieved by allowing those acts." RESTATEMENT (SECOND) OF PROPERTY, §12.2, cmt. (j) (1977).

That the words, alter, modify, reconstruct, and rebuild were followed by the phrase "without restriction" does not change our conclusion. This is so because the intent of the parties *viz-a-viz* the agreement remains paramount and controlling. That is, and as mentioned in the body of the opinion, while words generally will be given their plain grammatical meaning, that is not true when doing so contradicts the intent of the parties. Here, the intent was to convert the building from racquetball courts to retail space available for sublet, as evinced by 1) granting K.C. the authority to modify and sublet the premises and 2) relieving K.C. of the prior use restrictions. In other words, the parties clearly intended to change the potential uses of the building, to convert it from one viable use to another. To construe the phrase "without restriction" as authorizing K.C. to obtain possession of the building, demolish its interior, and return a scarred, empty shell which

---

[1]Of course, one cannot deny that a land owner may give his tenant the right to destroy or substantially change the character of the leased premises. We simply hold that such a right is not implicit in the mere use of the terms "alter" or "modify" or some derivative thereof.

7

has little use while in that state would be to construe the phrase in a way contradicting the clear intent of the parties. That, we cannot do.

Moreover, in construing the words alter, modify, and without restriction as we do, we also harmonize the various provisions within the lease at bar. Indeed, one cannot rationally say that K.C. fulfilled its contractual duty to "keep [the premises] . . . in clean condition, and . . . deliver up [same] in a clean and sanitary condition . . . [and] in good repair and condition" at the end of the lease term if its supposed right to alter allowed it to gut the edifice and leave a scarred shell. So, in reading the power to alter and modify "without restriction" to exclude acts which result in substantial change or destruction to the identity of the premises, we are effectively harmonizing the right to alter with K.C.'s duty to maintain and return same in a clean condition and good repair.

Next, to take possession of a building containing racquetball courts, a stairway, lockers, whirl pool tub, glass doors, and wooden walls (to name a few amenities once found in the building) and return a gutted shell replete with water stains, missing ceiling tile, holes in the walls, and no access to its upper levels while stealing portions of the property removed is to commit acts of willful destruction without accompanying repair or reconstruction. That K.C. may have been allowed to alter "without restriction" is not permission to destroy. And, because the destruction brought upon the facility at bar was not permitted, it was wrongful for purposes of waste.

*No Harm*

Lastly, and assuming *arguendo* that the trial court erred in holding that K.C. committed waste, the finding did not harm K.C. This is so because the tenant was also

8

found to have breached its duty to "deliver the premises to the Lessor, at the termination of the lease, in 'good repair and condition . . . .'" So too did the trial court conclude that K.C. was "liable to the lessor for damages occasioned by the failure to [so] deliver the premises . . . ." Moreover, the court ultimately measured the damages recoverable by Dawkins as the "reasonable cost of repairs to [ ] place the premises in the condition that [they] would have been" but for the breached duty relating to "waste."

Given that K.C. attacked on appeal neither the finding of breached duty to return the structure in good repair and condition nor the conclusion that K.C. was liable to Dawkins for damages occasioned by the failure to so return the property, both bind this court and the litigants. And, to the extent that the formula utilized when measuring damages attributable to a breached duty to return property in good repair is the reasonable costs of repair or of returning the premises to the obligated condition, *see Dunlap v. Mars Plumbing Supply Co.*, 504 S.W.2d 917, 918 (Tex. Civ. App.--San Antonio 1973, no writ) (stating that the damages arising from breaching the duty to return property in good condition and repair is the cost of repairs to place the edifice in the obligated condition), *Bariod Div., Nat'l Lead Co. v. Early*, 390 S.W.2d 866, 868 (Tex. Civ. App.--Eastland 1965, no writ) (stating the same); *Whitworth Estate v. Mangels of Texas, Inc.*, 363 S.W.2d 851, 858 (Tex. Civ. App.--Waco 1962, no writ) (holding the same), and that was the formula ultimately utilized by the court, we find no harm.[2]

### Issues Two, Three, and Four

---

[2]K.C. acknowledged in its brief that the reasonable costs of repairs was the measure of damages used to calculate an award to redress a breached duty to return leased premises in good repair.

9

Through its remaining issues, K.C. attacks the measure of damages utilized by the trial court. It initially posits that the correct measure was not the cost of repair but the difference between the value of the property before and after the injury. Then, it urges that the ultimate award of $333,000 as the cost of repair lacked legally and factually sufficient evidentiary basis. Finally, resolution of both of these issues purportedly merits reversal, says K.C. We again disagree and overrule the contentions.

*Appropriate Measure of Damages*

Assuming *arguendo* that the measure of damages applicable to waste is the difference in value before and after the injury, it is not *viz-a-viz* breached duty to repair, as illustrated above. Again, when attempting to recompense a breached duty to return in good repair, the measure is the costs of repairing the building or returning it to the obligated condition. *Dunlap v. Mars Plumbing Supply Co.*, *supra*; *Bariod Div., Nat'l Lead Co. v. Early*, *supra*; *Whitworth Estate v. Mangels of Texas, Inc., supra*. And, as was also discussed above, the trial court found that K.C. breached its duty to return the property in good repair (a finding K.C. does not dispute on appeal). So, because the measure of damages is the cost of repair when attempting to recompense a breached duty to repair and because the trial court ultimately utilized that measure in calculating damages, we again find that K.C. suffered no harm.

In short, the court was entitled to award damages for waste or breach of the duty to return the property in good repair. The damages eventually awarded comported to those recoverable for breached duty to return in good repair, irrespective of how the court characterized them. So, we cannot say that K.C. was harmed.

10

*Legal and Factual Sufficiency of the Evidence Supporting the Damage Award*

As to the legal and factual sufficiency of the damage award, we apply the standard discussed in *Raw Hide Oil & Gas, Inc. v. Maxus Exploration Co.*, 766 S.W.2d 264, 275-76 (Tex. App–Amarillo 1988, no writ), and refer the litigants to that case for an explanation of same. Furthermore, the court found the cost to repair the premises and place it in the condition it should have been in was $333,000. That amount approximated the sum derived by multiplying 11,000 by $30. Moreover, the number 11,000 represented the number of square feet in the building which were affected by K.C.'s demolition efforts, while the number $30 represented the approximate cost of repairing the premises to the condition of mid-range retail space. Given this, we hold that there is some evidence of record supporting the trial court's damage calculation.

As to the contention regarding factual insufficiency, we note that Dawkins' expert was unable to say with certainty what the actual cost of repair would be. Much depended upon the desires of the tenants which would ultimately rent the building. Thus, he proposed a range of $30 to $40 dollars a square foot. That amount was far less than the $450,000 plus it would have cost to repair the building to the state of a racquetball club. Moreover, in adopting the low portion of the $30 to $40 range and awarding damages of $333,000, the trial court implicitly concluded that K.C. did not have to repair the building to its status as a racquetball club, *i.e.* repair it to its original identity. Rather, it implicitly held that the tenant need only have repaired the building to the state of retail space available for sublet. And, that state was the one contemplated by the parties when they executed the lease extension. So, in effect, by awarding damages equal to the amount

needed to create retail space available for sublet, the trial court awarded damages equal to the cost of restoring the edifice to the obligated condition, and, after all, that is the measure of damages applicable to redressing a breached duty to repair and return the property in good condition. *Dunlap v. Mars Plumbing Supply Co.*, 504 S.W.2d at 918.

Additionally, it is clear that damages need not be established with mathematical precision. *Gulf Coast Inv. Corp. v. Rothman*, 506 S.W.2d 856, 858 (Tex. 1974); *Oyster Creek Fin. Corp. v. Richwood Invs. II, Inc.,* 957 S.W.2d 640, 649 (Tex. App.–Amarillo 1997, pet denied). Rather, one need only bring forward the best evidence of the damage of which the situation admits and from which reasonable inferences may be made. *Id.* Here, to repair the building to its condition at the time the lease was executed would be to do that which was never contemplated under the lease. Again, all intended at that time that the premises would be converted into retail space available for sublet to third-parties. And, because it was not previously retail space as contemplated by the parties, Dawkins' expert could only approximate the range of the costs involved in placing the building in the obligated condition. Admittedly, the actual costs could vary given the dictates of potential lessees. Yet, the opinion rendered by the expert was based upon his experience in building "mid-range" retail space. Under these circumstances, the opinion is susceptible to consideration as the best evidence of the damage and provided basis for the fact-finder to reasonably infer the cost of repair. Thus, the evidence supporting the trial court's determination, when tested against the entire record, was not so weak nor was the sum awarded so contrary to the overwhelming weight of the evidence so as to render the finding clearly wrong or manifestly unjust.

Accordingly, for the reasons stated above, we affirm the judgment of the trial court.


Brian Quinn
Justice


13

Publish