JAMESTOWN PARTNERS,
L.P., Appellant,

v.

The CITY OF FORT WORTH,
Appellee.

No. 2–01–299–CV.

Court of Appeals of Texas,
Fort Worth.

Aug. 8, 2002.

Rehearing Overruled Sept. 12, 2002.

Conley & Rosenberg, P.C., Jay M. Rosenberg, Phillip J. Conley, Addison, for appellant.

David L. Yett, Fort Worth City Attorney, Laetitia Coleman Brown, Assistant Fort Worth City Attorney, Fort Worth, for appellee.

PANEL B: LIVINGSTON, DAUPHINOT, and HOLMAN, JJ.

## OPINION

TERRIE LIVINGSTON, Justice.

### INTRODUCTION

The City of Fort Worth ("the City") brought an action against Jamestown Partners, L.P. ("appellant") under chapter 54 of the local government code.[1] The City sought to enforce by injunction and civil penalty alleged violations of ordinances concerning the substandard condition of an apartment complex owned by appellant. After a bench trial, the trial court entered judgment in favor of the City. The trial court denied appellant's motion for new trial, but granted its motion to suspend enforcement of the judgment pending appeal. In ten points, appellant complains that: (1) a compliance agreement between it and appellee, which was still in effect at the time of suit, barred any chapter 54 action; (2) appellee breached the compliance agreement by filing suit and is thus liable to appellant; (3) there was no evidence or insufficient evidence to support the trial court's findings that the apartments were "dangerously deteriorated" and a "threat to public safety"; (4) the repair order contained in the judgment is not authorized by chapter 54 and is impracticable and impossible to perform; and (5) the trial court's findings of fact and conclusions of law are insufficient to support the judgment. We affirm the trial court's judgment.

### BACKGROUND

This suit revolves around a vacant apartment complex located in southeast Fort Worth known as the Jamestown Apartments ("the Jamestown Property"). Appellant owned the Jamestown Property but sold it to Alfred Antonini and his companies. Antonini acquired the property through a purchase money promissory note secured by a deed of trust held by appellant. Antonini later conveyed the apartments to Tarrant County Affordable Housing Corporation, an entity with one shareholder, Albert Stowell. Stowell was also the sole shareholder in two other entities which each owned an apartment complex adjacent to the Jamestown Property.

In March of 1998, the City brought Stowell and one of the adjacent properties, the Evergreen Apartments, before the City's Building Standards Commission ("BSC"). The BSC issued an order finding those apartments to be substandard and a threat to public safety. In June of 1998, Stowell and his entities entered into a compliance agreement with the City concerning all three properties. The agreement provided that Stowell, as owner of

---

1. Tex. Loc. Gov't Code Ann. §§ 54.012–.019 (Vernon 1999).

the properties, would erect a fence around all three and board up and secure all the windows and doors of the buildings. Stowell also agreed to post and maintain a twenty thousand dollar bond on the properties; to submit an application to change the properties' zoning designation; and to provide a site plan that addressed, among other things, reducing the number of units by twenty percent and using part of the properties as a community youth center and police station. In exchange, the city agreed to reverse the order on the Evergreen Apartments and refrain from scheduling the other two properties, including the Jamestown Property, for BSC review.

Both Antonini and Stowell failed to make payments on the loan securing the Jamestown Property. In February of 1999, appellant foreclosed on the Jamestown Property pursuant to the deed of trust. Appellant regained ownership of the Jamestown Property in the foreclosure sale. A dispute arose between appellant, Stowell, and Antonini which resulted in litigation over title to the Jamestown Property. This litigation was eventually resolved or settled in favor of appellant by the middle of the year 2000.

In January of 2000, the City brought the present action against appellant to obtain demolition or repair orders on the Jamestown Property pursuant to chapter 54, subchapter B, of the local government code. *See* Tex. Loc. Gov't Code Ann. §§ 54.012–.019. Those provisions of the local government code authorize municipalities to enforce certain types of ordinances by a civil action seeking an injunction and civil penalties. *Id.* Appellant filed a counterclaim for breach of contract and for declaratory relief. After a bench trial, the trial court entered judgment in favor of

the City. Appellant requested and the trial court made findings of fact and conclusions of law. The trial court denied appellant's request for any additional findings or conclusions.

## DISCUSSION

### Effect of Compliance Agreement on Chapter 54 Action

In its first point, appellant claims the compliance agreement barred the City's chapter 54 action.[2] To determine the merits of this argument, we will look to the language of the compliance agreement. The compliance agreement provided:

> the portions of the Property know as Jamestown Apartments and Trinity Garden Apartments will be *scheduled for BSC review* unless this Agreement is approved by all parties; and

> ... should the Owner fail to satisfy all of the requirements of this Agreement the Property is *subject to further BSC review.* [Emphasis added.]

▪ A municipality may enter into and be bound by a contract the same as a private entity. *See Avmanco, Inc. v. City of Grand Prairie,* 835 S.W.2d 160, 165 (Tex.App.-Fort Worth 1992, writ dism'd). When we interpret a contract, we must determine whether the contract is ambiguous. *Coker v. Coker,* 650 S.W.2d 391, 394 (Tex.1983). A contract is ambiguous if, after examining the contract as a whole in light of the circumstances existing at the time the contract was signed and after applying the rules of construction, we conclude that its meaning is uncertain and doubtful. *Id.* at 393. If the contract is not ambiguous, but the parties disagree over the meaning of a provision, a court must

---

2. Both parties agree that the intent of the compliance agreement was that it would run with the land and that when appellant fore-

closed on the Jamestown Property, it did so subject to the agreement.

determine the parties' intent. *Id.* This is a question of law for the court. *MCI Tele-comms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex.1999); *Coker*, 650 S.W.2d at 394. The intent of the parties must be taken from the agreement itself, and the agreement must be enforced as written. *Sun Oil Co. v. Madeley*, 626 S.W.2d 726, 728 (Tex.1981).

The compliance agreement in this case is not ambiguous. The agreement provides that the City would proceed with a *building standards commission review* of the Jamestown Property unless appellant approved the agreement and satisfied its requirements. Applying rules of construction, we cannot interpret the phrase "BSC review" in such a way that it includes "civil action to enforce the ordinance." [3] Thus, the City's obligation to forego BSC review does not preclude it from pursuing any other remedies.

■ Courts presume the parties to a contract knew and took into consideration the laws affecting matters about which they contracted, unless the contrary clearly appears in the terms of the contract. *Colo. Interstate Gas Co. v. Hunt Energy Corp.*, 47 S.W.3d 1, 8 (Tex.App.-Amarillo 2000, pet. denied); *see Hardware Dealers Mut. Ins. Co. v. Berglund*, 393 S.W.2d 309, 315 (Tex.1965); *Grounds v. Tolar ISD*, 694 S.W.2d 241, 244 (Tex.App.-Fort Worth 1985), *rev'd on other grounds*, 707 S.W.2d 889 (Tex.1986). The portion of the City's Minimum Building Standards Code which enumerates what remedies are available to the City for violations of the code's provisions sets forth five options. The City may: (1) merely issue a notice of the viola-

tion; (2) enter into a compliance agreement for the correction of the violation; (3) bring the violator before the BSC; (4) bring a civil action under chapter 54; and/or (5) enforce the ordinance through a criminal proceeding. *See* FORT WORTH, TEX., REV. ORDINANCES ch. 7, art. IV, §§ 7–97, 7–98, 7–102, 7–112, 7–125 (1986) (effective Mar. 31, 1997). Each of these options is set forth in a separate section or sections of the code. The code provides that none of these options is a bar to or a prerequisite for taking any other action against the owner. *Id.* §§ 7–97(e), 7–98(c), 7–102(k), 7–112(b), 7–124(c). Further, the heading of the ordinance section which authorizes civil actions under chapter 54, entitled "Civil Action Without Commission Hearing," makes it clear that a hearing before the BSC is something separate and apart from a civil action. *Id.* § 7–112.

The legislature has also made it clear there is a difference between civil actions to enforce ordinances and quasi-judicial enforcement through a building standards commission. The provisions governing those two types of enforcement are located in separate and distinct subchapters of chapter 54.[4] *See* TEX. LOC. GOV'T CODE ANN. §§ 54.012–.019 (Subchapter B) (governing civil actions to enforce health and safety ordinances); *id.* §§ 54.031–.043 (Vernon 1999 & Supp.2002) (Subchapter C) (governing quasi-judicial enforcement by building and standards commission of health and safety ordinances). Thus, the City's Minimum Building Standards Code and chapter 54 make it clear that BSC review is not the same as a chapter 54 civil action. As a result, when the City expressly prom-

---

**3.** Because the compliance agreement does not define "BSC review," we will use the term's plain, ordinary meaning. *See Heritage Res., Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex.1996); *Frady v. May*, 23 S.W.3d 558, 564 (Tex.App.-Fort Worth 2000, pet. denied).

**4.** This statement is for the purpose of illustration only because it does not directly apply to this case. It appears that subchapter C of chapter 54 has not been adopted by the City. *See* TEX. LOC. GOV'T CODE ANN. § 54.031.

ised not to bring the properties before the BSC, it did not also promise to would refrain from a chapter 54 action.

We note that this construction makes the compliance agreement, as it was drafted in this case, have little or no benefit to the owner of a substandard property. The City's promise not to bring the owner before the BSC is hollow if the City may then, without penalty, resort to one of the other options. But the terms of this particular agreement are clear, and we must construe it as written, without considering whether the contract was wisely made. *See Wooten Props., Inc. v. Smith,* 368 S.W.2d 707, 709 (Tex.Civ.App.-El Paso 1963, writ ref'd). Appellant's first point is overruled.

In its related fourth point, appellant claims that section 7–98 of the City's Minimum Building Standards Code may not be applied in a manner that allows the City to renege on its compliance agreement with appellant. That section, in its entirety, provides:

**Section 7–98. Compliance Agreement.**

(a) The Superintendent may enter into a compliance agreement with any owner ... of property that is not in compliance with [the minimum building standards code].

(b) The agreement may include specific corrective action to be taken by the owner ... to correct the noncompliance within a time period specified by the agreement.

(c) A compliance agreement shall not be a bar against nor prerequisite for taking *any other action* against the owner of the property.

FORT WORTH, TEX., REV. ORDINANCES ch. 7, art. IV, § 7–98 (emphasis added). Appellant argues that the language of subsection (c) that allows "any other action" refers to actions *other than* those the City promised

not to pursue in the compliance agreement. Assuming this interpretation is correct, it has no impact on our decision. As we have set forth above, the compliance agreement says nothing about whether the City may maintain a civil action under chapter 54. Thus, the compliance agreement was only a contractual bar to any further review by the City's BSC. The agreement did not preclude a civil action under subchapter B of chapter 54 of the local government code. Appellant's fourth point is overruled.

Because we have concluded that the compliance agreement was not a bar to the City's chapter 54 suit, the propriety of the trial court's judgment does not depend upon whether that agreement was viable at the time the suit was filed. Accordingly, we do not need to discuss appellant's second point, claiming it had not materially breached the compliance agreement, or its third point, claiming that, even if it had materially breached the compliance agreement, the breach had been waived by the City. *See* TEX.R.APP. P. 47.1.

In its fifth point, appellant complains the trial court should have granted judgment in its favor on its breach of contract counterclaim. Again, the City's chapter 54 action was not inconsistent with the terms of the compliance agreement. Thus, the act of filing the chapter 54 action was not a breach of the compliance agreement. Appellant's fifth point is overruled.

### No Evidence and Insufficient Evidence Points

In its sixth and seventh points, appellant claims there is no evidence or insufficient evidence to support the trial court's findings that forty-two of the forty-four buildings on the Jamestown Property were "dangerously damaged and deteriorated" and a "threat to public safety."

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex.1991) (orig. proceeding). A trial court's findings of fact are reviewable by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex.1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994).

In determining a "no-evidence" point, we are to consider only the evidence and inferences that tend to support the finding and disregard all evidence and inferences to the contrary. *Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex.2001); *Cont'l Coffee Prods. Co. v. Cazarez,* 937 S.W.2d 444, 450 (Tex.1996); *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951). Anything more than a scintilla of evidence is legally sufficient to support the finding. *Cazarez,* 937 S.W.2d at 450; *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996).

A "no-evidence" point may only be sustained when the record discloses one of the following: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla of evidence; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998) (citing Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error,* 38 TEX. L. REV. 361, 362–63 (1960)), *cert. denied,* 526 U.S. 1040, 119 S.Ct. 1336, 143 L.Ed.2d 500 (1999). There is some evidence when the proof supplies a reasonable basis on which reasonable minds may reach different conclusions about the existence of the vital fact. *Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992).

An assertion that the evidence is "insufficient" to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered. *Garza v. Alviar,* 395 S.W.2d 821, 823 (Tex.1965). We are required to consider all of the evidence in the case in making this determination. *Mar. Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.), *cert. denied,* 525 U.S. 1017, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998).

We believe the trial court's findings are supported by sufficient evidence. Officer Pat Conrad, a senior code compliance officer for the City, had thoroughly inspected the Jamestown Property in 1995 and again in 1999. He testified at length as to the condition of all of the buildings located on the property and stated that in his opinion, all but two of the buildings were dangerously deteriorated. His report showed sagging and collapsing roofs, holes in walls, missing siding and bricks, rotten wood, and inadequate support for porches. Officer Conrad testified that during his inspections, he could not inspect the second floors of the apartment buildings because the balconies were collapsing and dangerous. He also testified that those balconies posed a threat to the people who came on the property to keep the lawns mowed. Resolving all inferences in favor of the City, this evidence is clearly legally sufficient to support the court's findings that the structures on this property were dangerously damaged or deteriorated and a threat to public safety.

Appellant offered the testimony of James Drebelbis, a structural engineer, along with a report he had prepared to determine what buildings could be rehabil-

itated. Appellant's own expert admitted that the balconies were unsafe and in "pretty bad shape." He admitted that two of the buildings were collapsing and should be demolished. He also testified that several other of the structures were partially burned and falling in. Appellant essentially asserts that, in spite of this evidence, the apartment complex buildings cannot be dangerous to anyone or a threat to public safety because they were fenced in and boarded up. Appellant's expert, Mr. Drebelbis, testified that he did not consider the buildings dangerous, "simply because [they are] not inhabitable" and that "[t]here should be no public there."

Chapter 54, however, makes it clear that its provisions were enacted to protect all members of the public, other than the defendant. *See* TEX. LOC. GOV'T CODE ANN. § 54.016(a) (stating injunction may issue on a showing of danger of "injury or an adverse health impact to *any person* . . . other than the defendant."). Officer Conrad could not rule out the possibility of illegal trespassers. Officer Conrad also pointed out that the complex was still an attraction for vagrants and homeless seeking shelter or a place to hide. The evidence also demonstrated that the existence of a fence is not a failsafe method to ensure the property is isolated from the public. When Mr. Drebelbis conducted his inspection of the property, he discovered that the fence had been inadvertently left unlocked. In light of this evidence, we cannot conclude that the evidence in support of the trial court's findings that the Jamestown Property was "dangerously damaged or deteriorated" and "a threat to public safety" is weak or that the evidence to the contrary is overwhelming. Because the evidence in support of the trial court's

finding is legally and factually sufficient, we overrule appellant's sixth and seventh points.

### Propriety of Demolition and Repair Order

In its eighth and ninth points, appellant claims the demolition and repair order contained in the final judgment was improper. Appellant simply claims the trial court's order is unreasonable. Specifically, appellant asserts the trial court exceeded its authority under chapter 54 and also complains the order is impossible or impracticable to perform.

▇▇▇▇ On appeal from a judgment either denying or granting a permanent injunction,[5] the standard of review is clear abuse of discretion. *All Am. Builders, Inc. v. All Am. Siding of Dallas, Inc.*, 991 S.W.2d 484, 487 (Tex.App.-Fort Worth 1999, no pet.); *2300, Inc. v. City of Arlington*, 888 S.W.2d 123, 126 (Tex.App.-Fort Worth 1994, no writ). The question for the appellate court is whether the trial court acted without reference to any guiding rules and principles. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *All Am.*, 991 S.W.2d at 487. Simply because the trial court decided a matter differently than the appellate court would under similar circumstances is not an abuse of discretion. *Downer*, 701 S.W.2d at 242; *All Am.*, 991 S.W.2d at 487.

The trial court's repair order provided that appellant would: (1) within 90 days of the order, begin demolition of ten buildings selected for demolition by the original PDSU plan; and (2) within 180 days of the order, complete the demolition and submit

---

5. The repair and demolition order in this case is a type of mandatory injunction authorized by statute. *See Hilb, Rogal & Hamilton Co. of*

*Tex. v. Wurzman*, 861 S.W.2d 30, 33 (Tex. App.-Dallas 1993, no writ).

a repair plan to the City. The order required that the new repair plan allow the City to inspect the Jamestown Property every thirty days. The order also required appellant to pay a $25,000 bond to secure performance of the repair plan.[6]

■ Appellant argues that the 180 days given to complete the demolition is unreasonable because mandating that the demolition be completed in such a short period of time is cost prohibitive. But Paul Bounds, the code compliance superintendent for the City, testified that 90 days was a reasonable amount of time to perform the demolition of the ten buildings marked for destruction. Further, it appears that the schedule contained in the trial court's order is similar to one set forth not in chapter 54, but in another provision of the local government code. *See* TEX. LOC. GOV'T CODE ANN. § 214.001(a) (Vernon Supp.2002). Chapter 214 of the local government code allows certain municipalities to require repair or demolition of a substandard building by ordinance rather than seeking an injunction under chapter 54. *Id.* Section 214.001 contemplates giving an owner as little as thirty days to perform the demolition or repair of the structure. *Id.* § 214.001(h). The statutory language in that section further suggests that ninety days is the *maximum* amount of time allotted for demolition or repair unless the owner meets certain criteria. *Id.* § 214.001(j).[7]

6. Although appellant's briefing on this issue suggests the that the repair order gives only 180 days for demolition *and* repair of the property, that is not the case. The repair order gives approximately two years after approval of the plan for repairs to be completed.

7. That section provides:

(j) A municipality *may not allow* the owner, lienholder, or mortgagee more than 90 days to repair, remove, or demolish the building or fully perform all work required

■ Appellant also complains that the trial court's order forces it to post a $25,000 performance bond and allows the City the right to inspect the progress of the repairs. A performance bond requirement, however, may also be found in chapter 214. *Id.* § 214.001(k). That section allows municipalities to obtain a bond covering the costs of the repair or demolition when the properties exceed $100,000 in total value.[8] *Id.* Section 214.001 also provides methods for monitoring an owner's compliance with an order's schedule. *Id.* We must presume the legislature acts reasonably when it enacts a statute. *See Weiner v. Wasson*, 900 S.W.2d 316, 330 (Tex.1995); *Smith v. Davis*, 426 S.W.2d 827, 831 (Tex.1968). As a result, we cannot conclude that the trial court's order in this case, which essentially mimics the provisions of an analogous statute, is unreasonable. Accordingly, appellant's eighth and ninth points are overruled.

### Findings of Fact and Conclusions of Law

■ In its tenth point, appellant claims the trial court erred when it did not file additional findings of fact and conclusions of law as requested. A trial court is required to file findings of fact and conclusions of law within twenty days after a timely request is made. *See* TEX.R. CIV. P. 297. Upon a party's timely request for

to comply with the order unless the owner, lienholder, or mortgagee:

(1) submits a detailed plan and time schedule for the work at the hearing; and

(2) establishes at the hearing that the work cannot reasonably be completed within 90 days because of the scope and complexity of the work.

TEX. LOC. GOV'T CODE ANN. § 214.001(j) (emphasis added).

8. The Jamestown Property exceeds $100,000 in value.

additional findings, the trial court "shall file any additional or amended findings and conclusions that are *appropriate.*" TEX.R. CIV. P. 298 (emphasis added). Additional findings are not required if the original findings of fact and conclusions of law "properly and succinctly relate the ultimate findings of fact and law necessary to apprise [the party] of adequate information for the preparation of his or her appeal." *In re Marriage of Morris,* 12 S.W.3d 877, 886 (Tex.App.-Texarkana 2000, no pet.); *see also Finch v. Finch,* 825 S.W.2d 218, 221 (Tex.App.-Houston [1st Dist.] 1992, no writ). If the record indicates that a party did not suffer injury, the failure to make additional findings does not require a reversal. *Johnston v. McKinney Am., Inc.,* 9 S.W.3d 271, 277 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). If the refusal to file additional findings does not prevent a party from adequately presenting an argument on appeal, there is no reversible error. *See ASAI v. Vanco Insulation Abatement, Inc.,* 932 S.W.2d 118, 122 (Tex.App.-El Paso 1996, no writ).

Appellant first complains the trial court made a specific finding that a breach of the compliance agreement had occurred concerning the Evergreen Apartments, but did not make a finding regarding whether there had been a breach concerning the Jamestown Property. As we have reasoned above, the propriety of the trial court's judgment on the City's chapter 54 action does not depend on who breached the agreement or even on whether the agreement was breached at all.

The findings of fact made by the trial court in this case clearly support a judgment in the City's favor. Appellant complains, however, that the findings of fact and conclusions of law were not sufficient to support the *type of relief* given, that is, the right of the City to inspect, the perfor-

mance bond, and the deadlines in the repair order. No additional findings of fact, however, were requested on the propriety of the relief ordered; appellant thus did not preserve this portion of his complaint. *See In re M.W.T.,* 12 S.W.3d 598, 606 (Tex.App.-San Antonio 2000, pet. denied). Appellant only requested additional conclusions of law that state that the relief was "within the Court's authority" under chapter 54. These conclusions, however, were necessarily made given the fact the trial court signed an order granting such relief. As we have explained above, these conclusions were reasonable. Omission of these conclusions did not prevent appellant from presenting its appeal. Thus, appellant's tenth point is overruled.

### CONCLUSION

Having overruled each of appellant's points, we affirm the trial court's judgment.