

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

## NO. 02-10-00233-CV

EDWIN A. WHITE                                         APPELLANT

V.

MLMT 2004-BPC1 CARLYLE                                 APPELLEE
CROSSING, LLC, A DELAWARE
LIMITED LIABILITY COMPANY

----------

FROM THE 96TH DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

This is an appeal from a judgment in favor of appellee MLMT 2004-BPC1 Carlyle Crossing, LLC for $1,766,355.52 in a bench trial on appellee's cause of action for waste of collateral. In two issues, appellant Edwin A. White, an indemnitor under the loan agreements, contends that the evidence is insufficient

---

[1]*See* Tex. R. App. P. 47.4.

to support the damage award and that the express negligence doctrine does not apply to relieve appellee of its own negligence. We affirm.

**Background Facts**

MBS-Carlyle Crossing, Ltd. (MBS), through its agent, Michael Smuck, executed a $5.5 million promissory note made payable to PNC Bank; the debt was secured by real property, the Carlyle Crossing Apartments. Appellant did not sign the note or deed of trust, but he did sign a nonrecourse indemnification agreement along with Smuck in which he "assume[d] liability for and agree[d] to pay . . . [PNC] from and against any and all liabilities . . . which at any time may be imposed upon, incurred by[,] or awarded against [PNC] and for which borrower at any time may be personally liable." A section of the note said that PNC could obtain personal, recourse judgments against any person or entity relating to PNC's losses sustained by fraud, intentional misrepresentation, or waste.

PNC assigned the note, deed of trust, and other loan documents to LaSalle Bank National Association, as trustee for Merrill Lynch Mortgage Trust 2004-BPC1.[2] MBS began missing payments on the note in September 2007, and LaSalle as trustee delivered a demand letter to appellant, MBS, and Smuck. The trust then accelerated the maturity of the note, advised appellant, MBS, and Smuck of the acceleration, and posted the property for foreclosure.

---

[2]The loan to MBS was placed into a securitized pool.

In October 2007, the trust hired Jay Parmelee with Lincoln Property Company to investigate whether a receivership was warranted. Upon initial inspection, Parmelee found that the property was not highly occupied and that there was broken glass in windows, holes in the parking lot, running water bubbling up in the pavement, and fences and access gates down, among other problems. A trial court appointed Parmelee receiver of the property on November 1, 2007 at 4:35 p.m. Parmelee and a team from Lincoln took over management of the apartments and performed a unit-by-unit inspection of the property, noting numerous problems with both the exterior and interior of the property that required significant repair and replacement.

The trust formed appellee to take title to the property on foreclosure and assigned the loan documents to appellee. Appellee was the successful bidder at the foreclosure sale.

Appellee sued MBS, Smuck, appellant, and appellant's wife, Ellen, claiming that waste had occurred at the property for which they were responsible under the note, deed of trust, and indemnity agreement. The trial court rendered judgment against MBS, Smuck, and White for $1,766,355.52.[3] White appealed.

### Damages for Waste

In his first issue, appellant contends that the damage award is not supported by the evidence.

---

[3]Appellee nonsuited Ellen.

**Standard of Review**

Findings of fact entered in a case tried to the court have the same force and dignity as a jury's answers to jury questions. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them by the same standards that are applied in reviewing evidence supporting a jury's answer. *Ortiz v. Jones,* 917 S.W.2d 770, 772 (Tex. 1996); *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex. 1994).

We may sustain a legal sufficiency challenge only when (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact. *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998), *cert. denied*, 526 U.S. 1040 (1999); Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 Tex. L. Rev. 361, 362–63 (1960). In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005).

When reviewing an assertion that the evidence is factually insufficient to support a finding, we set aside the finding only if, after considering and weighing all of the evidence in the record pertinent to that finding, we determine that the credible evidence supporting the finding is so weak, or so contrary to the overwhelming weight of all the evidence, that the answer should be set aside and a new trial ordered. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986) (op. on reh'g); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). Accordingly, when the party *without* the burden of proof on a fact issue complains of an adverse fact finding, that party must show that there is "insufficient evidence" supporting the finding, that is, that the credible evidence supporting the finding is too weak or that the finding is against the great weight and preponderance of the credible evidence contrary to the finding. *See Garza*, 395 S.W.2d at 823; W. Wendall Hall, *Standards of Review in Texas*, 38 St. Mary's L.J. 47, 263, 265 (2006).

**Analysis**

According to appellant, appellee failed to prove with specificity the amount of damages above normal wear and tear on a building; thus, appellee failed to prove damages attributable to "waste" rather than depreciation.

The indemnification agreement stated that appellant would indemnify appellee for any losses incurred by appellee for which MBS was personally liable under paragraph 12 of the note. Paragraph 12 of the note provided that MBS would not be personally liable for any damages in connection with the loan

5

documents except for certain specified situations, including "waste," which is undefined. The trial court found that appellant committed waste and that "correction and/or repair of the waste has a reasonable cost of $1,066,355.32 [and] lease-up costs of $700,000.00."

Because waste is not defined in the contract, and there is no indication the parties intended a technical or specialized meaning, we use its plain, ordinary meaning. *See DeWitt Cnty. Elec. Co-op, Inc. v. Parks*, 1 S.W.3d 96, 101 (Tex. 1999); *Jamestown Partners, L.P. v. City of Fort Worth*, 83 S.W.3d 376, 381 n.3 (Tex. App.—Fort Worth 2002, pet. denied). To establish a claim of waste, a party must show an injury to the reversionary interest in land caused by the wrongful act of a tenant or other party rightfully in possession. *R.C. Bowen Estate v. Cont'l Trailways*, 256 S.W.2d 71, 72 (Tex. 1953); *Fath v. CSFB 1999-C1 Rockhaven Place Ltd. P'ship*, 303 S.W.3d 1, 7 (Tex. App.—Dallas 2009, pet. denied); *King's Court Racquetball v. Dawkins*, 62 S.W.3d 229, 232–33 (Tex. App.—Amarillo 2001, no pet.). A mortgagee may bring an action for waste when the value of security is threatened.[4] *Taylor v. Brennan*, 605 S.W.2d 657, 658

---

[4]The parties submitted the damage issue to the trial court on a cost-of-repair-and-replacement theory; appellant has not challenged that measure of damages theory at trial or on appeal, only whether the evidence submitted supports that theory. *See Carroll v. Edmondson*, 41 S.W.2d 64, 65 (Tex. Comm'n App. 1931, judgm't adopted); *Frio Invs., Inc. v. 4M-IRC/Rohde*, 705 S.W.2d 784, 786 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.); *Payne v. Snyder*, 661 S.W.2d 134, 141 (Tex. App.—Amarillo 1983, writ ref'd n.r.e.); *Wheeler v. Peterson*, 331 S.W.2d 81, 83 (Tex. App.—Fort Worth 1959, writ dism'd).

(Tex. Civ. App.—Houston [1st Dist.] 1980), *rev'd in part on other grounds*, 621 S.W.2d 592 (Tex. 1981); *Brader v. Ellinghausen*, 154 S.W.2d 662, 665 (Tex. Civ. App.—Fort Worth 1941, no writ).

Parmelee testified that he performed an initial walk through of the complex upon being named receiver and estimated the readily observable damage at $847,200; that is, that amount was his estimate and opinion of what was immediately necessary to make the complex marketable and was not attributable to ordinary wear and tear. For example, Parmelee testified that a number of the units had leaks that were so bad that significant mold had grown on the walls, carpets, and flooring; in some, sheetrock was missing from the ceiling. In addition, in some units, electricity had been disconnected for nonpayment, meters had been removed, and air conditioning units had been removed from their pads and were missing. "Hot" wires from the missing air conditioning units had been left exposed where even a child could touch them. The pool had been closed for health infractions and code compliance issues. Some units were missing refrigerators, stoves, appliances, and locks. Some units had broken glass that appeared to have been in that condition for some time, fences were down, and the parking lot had holes and running water bubbling up through the pavement. Out of 138 total units, 101 needed repairs before being ready to lease, and 32 were completely uninhabitable and had to be "taken down to the shell." From December 2007 through May 2008, all expenses paid by the receiver other than utilities were for deferred maintenance, i.e., repairs and

7

replacement occasioned by the routine maintenance that had been delayed. According to Parmelee, this type of damage was beyond normal wear and tear.

Parmelee also testified that when he took over as receiver, the occupancy rate had gone from 94% in July 2004 to less than 50% in November 2007. Moreover, the property had been mismanaged: tenants were not properly qualified, maintenance requests had not been adequately responded to, items were missing from the disorganized leasing files, and rental payments from November 1, 2007 may not have been credited.

Michael Walker, appellee's expert witness, testified that of the $847,200 in damage observed by Parmelee, only ten to fifteen percent of those items were attributable to normal wear and tear. Thus, $720,120 would be above normal wear and tear. Walker also testified that an additional $400,000 would be necessary to fully restore the damage to the property beyond normal wear and tear. He based this estimation on a December 2007 report from CB Richard Ellis estimating that $1,242,000 would be required to make all the necessary repairs. Accordingly, the evidence supports a damage award of at least $1,120,120 for repairs over and above normal wear and tear, which is more than what the trial court found.

Appellee presented evidence that its actual expenditures for the necessary repairs and replacements totaled $1,254,535.67; the trial court's damage award deducts fifteen percent from this amount for total repair and replacement damages of $1,066,355.32. This amount is thus supported by the evidence.

8

Walker also testified that the income from the property was much lower than it should have been because of the low occupancy rate. In fact, it was not enough to cover the property's operating expenses. Accordingly, Walker testified that appellee would lose $700,000 in income stream for the twenty-two months it would take to achieve a 90% occupancy rate at the property. Accordingly, the evidence supports the trial court's total award of $1,766,355.32.

One of appellant's main arguments at trial was and on appeal is that appellee could not prove which of the items needing repair and replacement would have needed that work anyway because of ordinary wear and tear. But Walker testified that such a determination would be impossible with missing items, especially; appellee would have no way of knowing in what condition those items were before they were removed. In addition, although Walker testified that some amount of deferred maintenance was acceptable, both Walker and Parmelee testified that the overall condition of the property showed a pattern of long-term neglect and deferred maintenance, which caused damage to become progressively worse and eventually caused more damage. Thus, the trial court could have believed Walker's and Parmelee's testimony that the extent of the damage was such that it was above and beyond normal wear and tear.

Appellant also contends that the evidence is insufficient to support the trial court's failure to find that appellee's own negligence caused the waste, a theory appellant advanced at trial. The trial court did not apportion any responsibility to appellee in its findings of fact and conclusions of law; accordingly, we presume

9

that it found appellee zero percent negligent. *See First Nat'l Bank of Denver City v. Brewer*, 775 S.W.2d 51, 55 (Tex. App.—Amarillo 1989, no pet.). Therefore, we will review whether the trial court's finding of zero percent negligence has any support in the record.

Parmelee testified that he was appointed receiver at 4:35 p.m. on November 1, and he immediately dispatched a team from Lincoln to the property. The team arrived after 5:00 p.m. and found the property management office locked and inaccessible, so they came back the next morning at 8:30 a.m. and had a locksmith open the office. When they first got into the office, they saw that equipment and files were missing, and the phones had been disconnected; the team had not yet seen the interior of the units, so they did not know they would need on-site security in the event of vandalism.

Walker testified on cross-examination that he had been told by Kela Brooks, a manager for Lincoln on November 1, 2007, that she had gone by the property on the night of November 1, that there was a truck with a trailer parked outside the property management office, and that people were taking files and other items out of the office. This would have been after 4:35 p.m. when the trial court appointed Parmelee as receiver. But Walker also testified that MBS remained responsible for the property until Parmelee had taken physical possession of the property.

Although there is some evidence that the property was unsecured during a short period after the receiver was appointed, the trial court could have

reasonably inferred from Parmelee's and Walker's testimony that the damage to the property resulted from long-term neglect rather than vandalism or other damage occurring solely on one night after the receiver took over.

Appellant also cross-examined Parmelee and Walker, as well as Michael Cocanougher, a representative of one of the loan's servicers, about whether the lender was negligent by failing to more closely inspect the property according to its rights in the loan documents. The deed of trust gave the lender the right to physically inspect the property to make sure that it was being maintained appropriately. If, upon doing so, the lender determined that corrective measures were necessary, it could demand that MBS complete those corrections within ninety days or face default.

The evidence showed that Parmelee performed two physical inspections in early and mid-October 2007 when he was investigating whether a receivership was warranted. Although he did note numerous problems, he was not able to see the interior of units, so he did not know the full extent of the damage until he was able to access the property as receiver. Parmelee was asked about annual reports the lender had received from third-party inspection companies; according to Parmelee, it was hard for him to imagine that a grossly mismanaged property would receive a good rating from an inspector "[i]f an adequate job of inspection was being done as written by the inspector." He also said that the reported income from the property was inconsistent with the occupancy level.

Cocanaugher testified that the lender received property condition inspections in 2004 when the loan was originated and also in 2005, 2006, and 2007. The inspectors rated the property as "good" in 2005, 2006, and November 2007; the property's rating in the August 2007 inspection was "fair." The 2006 report noted that there was "major" deferred maintenance that needed to be done at the property, but it also stated that the property was "in better condition [than] the majority of the immediate competition." Cocanaugher testified that after the lender received the August 2007 report, it sent MBS a letter pursuant to the deed of trust demanding that the items listed in the report be fixed, but MBS stopped making payments in September 2007 and, thus, was already in default by the end of the ninety-day period for making such repairs. Cocanaugher further testified that the November 1, 2007 report was "absolutely" inaccurate, and that the lender did not accept it and refused to pay for it.

Cocanaugher and Walker testified that a property manager could manipulate the results of an inspection by showing the inspector only units that were in good condition. Property management knows about the inspections in advance and chooses the units to show to the inspector. Parmelee testified that from what he saw when he inspected the property in October 2007, the reports were not accurate and that he would have taken issue with them. According to Walker, although the inspection reports showed some "deterioration" at the property, it probably looked fine to the lender based on the photographs attached

12

to the reports. And although the reports showed a decline, they did not reflect the true condition of the property.

Finally, Cocanaugher testified that although lenders contract for periodic inspections and collect financial and operating statements from borrowers, a lender cannot always discern local or regional differences in property performance, especially if a loan is securitized, as this one was. According to Cocanaugher, the lender's main goal in reviewing these types of reports is to compare them against what was budgeted at loan origination and try to discern any "significant meaningful variance."

We conclude and hold that there was sufficient evidence from which the trial court as factfinder could have determined that none of the waste occurring at the property was attributable to any negligence of appellee, its predecessor, or both.

We overrule appellant's first issue.

### Express Negligence

In his second issue, appellant argues that the express negligence rule does not apply to relieve appellee of its own negligence.

The express negligence requirement is a rule of contract interpretation providing that an agreement purporting to indemnify the indemnitee against liability for its own negligence must clearly state that intent within the four corners of the agreement itself. *See Storage & Processors, Inc. v. Reyes*, 134 S.W.3d

13

190, 192 (Tex. 2004); *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987).

The indemnity provision here contains no language obligating appellant to indemnify appellee from its own negligence; instead, the indemnity provision seeks to have appellant indemnify appellee from any losses appellee incurred for which MBS was liable under the note. In effect, the indemnity agreement functioned as a guarantee that if MBS did not make good on any obligation for which it was liable under recourse provisions of the note and deed of trust, appellant would make good on them. *See Nat'l City Mortg. Co. v. Adams*, 310 S.W.3d 139, 143–44 (Tex. App.—Fort Worth 2010, no pet.) (op. on reh'g). Accordingly, the express negligence rule does not apply here to bar appellee's recovery pursuant to the terms of the indemnity agreement because appellee was not seeking recovery for its own negligence. *See, e.g., MAN GHH Logistics GMBH v. Emscor, Inc.*, 858 S.W.2d 41, 43 (Tex. App.—Houston [14th Dist.] 1993, no writ). We overrule appellant's second issue.

## Conclusion

Having overruled both of appellant's issues, we affirm the trial court's judgment.

TERRIE LIVINGSTON
CHIEF JUSTICE

PANEL:  LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

DELIVERED:  August 18, 2011