02-10-233-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

NO. 02-10-00233-CV 

 

 


 
 
 Edwin A. White
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 MLMT 2004-BPC1 Carlyle Crossing, LLC, a Delaware
 limited liability company
 
 
  
 
 
 APPELLEE 
 
 


 

 

----------

 

FROM THE 96th
District Court OF Tarrant COUNTY

----------

 

MEMORANDUM
OPINION[1]

----------

          This
is an appeal from a judgment in favor of appellee MLMT 2004-BPC1 Carlyle
Crossing, LLC for $1,766,355.52 in a bench trial on appellee’s cause of action
for waste of collateral.  In two issues, appellant Edwin A. White, an
indemnitor under the loan agreements, contends that the evidence is
insufficient to support the damage award and that the express negligence
doctrine does not apply to relieve appellee of its own negligence.  We affirm.

Background Facts

MBS-Carlyle
Crossing, Ltd. (MBS), through its agent, Michael Smuck, executed a $5.5 million
promissory note made payable to PNC Bank; the debt was secured by real
property, the Carlyle Crossing Apartments.  Appellant did not sign the note or
deed of trust, but he did sign a nonrecourse indemnification agreement along
with Smuck in which he “assume[d] liability for and agree[d] to pay . . . [PNC]
from and against any and all liabilities . . . which at any time may be imposed
upon, incurred by[,] or awarded against [PNC] and for which borrower at any
time may be personally liable.”  A section of the note said that PNC could
obtain personal, recourse judgments against any person or entity relating to
PNC’s losses sustained by fraud, intentional misrepresentation, or waste.

          PNC
assigned the note, deed of trust, and other loan documents to LaSalle Bank
National Association, as trustee for Merrill Lynch Mortgage Trust 2004-BPC1.[2]  MBS
began missing payments on the note in September 2007, and LaSalle as trustee delivered
a demand letter to appellant, MBS, and Smuck.  The trust then accelerated the
maturity of the note, advised appellant, MBS, and Smuck of the acceleration,
and posted the property for foreclosure.

          In
October 2007, the trust hired Jay Parmelee with Lincoln Property Company to investigate
whether a receivership was warranted.  Upon initial inspection, Parmelee found
that the property was not highly occupied and that there was broken glass in
windows, holes in the parking lot, running water bubbling up in the pavement,
and fences and access gates down, among other problems.  A trial court
appointed Parmelee receiver of the property on November 1, 2007 at 4:35 p.m. 
Parmelee and a team from Lincoln took over management of the apartments and
performed a unit-by-unit inspection of the property, noting numerous problems
with both the exterior and interior of the property that required significant
repair and replacement.

          The
trust formed appellee to take title to the property on foreclosure and assigned
the loan documents to appellee.  Appellee was the successful bidder at the
foreclosure sale.

          Appellee
sued MBS, Smuck, appellant, and appellant’s wife, Ellen, claiming that waste
had occurred at the property for which they were responsible under the note, deed
of trust, and indemnity agreement.  The trial court rendered judgment against MBS,
Smuck, and White for $1,766,355.52.[3]  White appealed.

Damages for
Waste

          In
his first issue, appellant contends that the damage award is not supported by
the evidence.

Standard of
Review

Findings
of fact entered in a case tried to the court have the same force and dignity as
a jury=s
answers to jury questions.  Anderson v. City of Seven Points, 806 S.W.2d
791, 794 (Tex. 1991).  The trial court=s
findings of fact are reviewable for legal and factual sufficiency of the
evidence to support them by the same standards that are applied in reviewing
evidence supporting a jury=s answer.  Ortiz v.
Jones, 917 S.W.2d 770, 772 (Tex. 1996); Catalina v. Blasdel, 881
S.W.2d 295, 297 (Tex. 1994).

          We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire Co. v. Martinez, 977 S.W.2d 328, 334
(Tex. 1998), cert. denied, 526 U.S. 1040 (1999); Robert W. Calvert, "No
Evidence" and "Insufficient Evidence" Points of Error, 38
Tex. L. Rev. 361, 362–63 (1960).  In determining whether there is legally
sufficient evidence to support the finding under review, we must consider
evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.  Cent. Ready Mix Concrete Co. v. Islas, 228 S.W.3d 649, 651 (Tex.
2007); City of Keller v. Wilson, 168 S.W.3d 802, 807, 827 (Tex. 2005).

          When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the
credible evidence supporting the finding is so weak, or so contrary to the
overwhelming weight of all the evidence, that the answer should be set aside
and a new trial ordered.  Pool v. Ford Motor Co., 715 S.W.2d 629, 635
(Tex. 1986) (op. on reh’g); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex.
1965).  Accordingly, when the party without the burden of proof on a
fact issue complains of an adverse fact finding, that party must show that
there is Ainsufficient evidence@
supporting the finding, that is, that the credible evidence supporting the
finding is too weak or that the finding is against the great weight and
preponderance of the credible evidence contrary to the finding.  See Garza,
395 S.W.2d at 823; W. Wendall Hall, Standards of Review in Texas,
38 St. Mary=s L.J. 47, 263, 265 (2006).

Analysis

          According
to appellant, appellee failed to prove with specificity the amount of damages above
normal wear and tear on a building; thus, appellee failed to prove damages
attributable to “waste” rather than depreciation.

          The
indemnification agreement stated that appellant would indemnify appellee for
any losses incurred by appellee for which MBS was personally liable under
paragraph 12 of the note.  Paragraph 12 of the note provided that MBS would not
be personally liable for any damages in connection with the loan documents
except for certain specified situations, including “waste,” which is undefined. 
The trial court found that appellant committed waste and that “correction
and/or repair of the waste has a reasonable cost of $1,066,355.32 [and] lease-up
costs of $700,000.00.”

Because
waste is not defined in the contract, and there is no indication the parties
intended a technical or specialized meaning, we use its plain, ordinary
meaning.  See DeWitt Cnty. Elec. Co-op, Inc. v. Parks, 1 S.W.3d 96, 101
(Tex. 1999); Jamestown Partners, L.P. v. City of Fort Worth, 83 S.W.3d
376, 381 n.3 (Tex. App.––Fort Worth 2002, pet. denied).  To establish a claim
of waste, a party must show an injury to the reversionary interest in land
caused by the wrongful act of a tenant or other party rightfully in
possession.  R.C. Bowen Estate v. Cont’l Trailways, 256 S.W.2d 71, 72 (Tex.
1953); Fath v. CSFB 1999-C1 Rockhaven Place Ltd. P’ship, 303 S.W.3d 1, 7
(Tex. App.––Dallas 2009, pet. denied); King’s Court Racquetball v. Dawkins,
62 S.W.3d 229, 232–33 (Tex. App.––Amarillo 2001, no pet.).  A mortgagee may
bring an action for waste when the value of security is threatened.[4] 
Taylor v. Brennan, 605 S.W.2d 657, 658 (Tex. Civ. App.––Houston [1st
Dist.] 1980), rev’d in part on other grounds, 621 S.W.2d 592 (Tex.
1981); Brader v. Ellinghausen, 154 S.W.2d 662, 665 (Tex. Civ. App.––Fort
Worth 1941, no writ).

Parmelee
testified that he performed an initial walk through of the complex upon being
named receiver and estimated the readily observable damage at $847,200; that
is, that amount was his estimate and opinion of what was immediately necessary
to make the complex marketable and was not attributable to ordinary wear and
tear.  For example, Parmelee testified that a number of the units had leaks that
were so bad that significant mold had grown on the walls, carpets, and flooring;
in some, sheetrock was missing from the ceiling.  In addition, in some units, electricity
had been disconnected for nonpayment, meters had been removed, and air
conditioning units had been removed from their pads and were missing.  “Hot”
wires from the missing air conditioning units had been left exposed where even
a child could touch them.  The pool had been closed for health infractions and
code compliance issues.  Some units were missing refrigerators, stoves,
appliances, and locks.  Some units had broken glass that appeared to have been
in that condition for some time, fences were down, and the parking lot had holes
and running water bubbling up through the pavement.  Out of 138 total units,
101 needed repairs before being ready to lease, and 32 were completely
uninhabitable and had to be “taken down to the shell.”  From December 2007
through May 2008, all expenses paid by the receiver other than utilities were
for deferred maintenance, i.e., repairs and replacement occasioned by the
routine maintenance that had been delayed.  According to Parmelee, this type of
damage was beyond normal wear and tear.

Parmelee
also testified that when he took over as receiver, the occupancy rate had gone
from 94% in July 2004 to less than 50% in November 2007.  Moreover, the
property had been mismanaged:  tenants were not properly qualified, maintenance
requests had not been adequately responded to, items were missing from the
disorganized leasing files, and rental payments from November 1, 2007 may not
have been credited.

          Michael
Walker, appellee’s expert witness, testified that of the $847,200 in damage
observed by Parmelee, only ten to fifteen percent of those items were
attributable to normal wear and tear.  Thus, $720,120 would be above normal
wear and tear.  Walker also testified that an additional $400,000 would be
necessary to fully restore the damage to the property beyond normal wear and
tear.  He based this estimation on a December 2007 report from CB Richard Ellis
estimating that $1,242,000 would be required to make all the necessary
repairs.  Accordingly, the evidence supports a damage award of at least $1,120,120
for repairs over and above normal wear and tear, which is more than what the
trial court found.

          Appellee
presented evidence that its actual expenditures for the necessary repairs and
replacements totaled $1,254,535.67; the trial court’s damage award deducts fifteen
percent from this amount for total repair and replacement damages of $1,066,355.32. 
This amount is thus supported by the evidence.

          Walker
also testified that the income from the property was much lower than it should
have been because of the low occupancy rate.  In fact, it was not enough to
cover the property’s operating expenses.  Accordingly, Walker testified that
appellee would lose $700,000 in income stream for the twenty-two months it
would take to achieve a 90% occupancy rate at the property.  Accordingly, the
evidence supports the trial court’s total award of $1,766,355.32.

          One
of appellant’s main arguments at trial was and on appeal is that appellee could
not prove which of the items needing repair and replacement would have needed
that work anyway because of ordinary wear and tear.  But Walker testified that
such a determination would be impossible with missing items, especially;
appellee would have no way of knowing in what condition those items were before
they were removed.  In addition, although Walker testified that some amount of
deferred maintenance was acceptable, both Walker and Parmelee testified that
the overall condition of the property showed a pattern of long-term neglect and
deferred maintenance, which caused damage to become progressively worse and
eventually caused more damage.  Thus, the trial court could have believed
Walker’s and Parmelee’s testimony that the extent of the damage was such that
it was above and beyond normal wear and tear.

          Appellant
also contends that the evidence is insufficient to support the trial court’s
failure to find that appellee’s own negligence caused the waste, a theory
appellant advanced at trial.  The trial court did not apportion any
responsibility to appellee in its findings of fact and conclusions of law;
accordingly, we presume that it found appellee zero percent negligent.  See First
Nat’l Bank of Denver City v. Brewer, 775 S.W.2d 51, 55 (Tex. App.––Amarillo
1989, no pet.).  Therefore, we will review whether the trial court’s finding of
zero percent negligence has any support in the record.

Parmelee
testified that he was appointed receiver at 4:35 p.m. on November 1, and he
immediately dispatched a team from Lincoln to the property.  The team arrived
after 5:00 p.m. and found the property management office locked and
inaccessible, so they came back the next morning at 8:30 a.m. and had a
locksmith open the office.  When they first got into the office, they saw that
equipment and files were missing, and the phones had been disconnected; the team
had not yet seen the interior of the units, so they did not know they would
need on-site security in the event of vandalism.

Walker
testified on cross-examination that he had been told by Kela Brooks, a manager
for Lincoln on November 1, 2007, that she had gone by the property on the night
of November 1, that there was a truck with a trailer parked outside the property
management office, and that people were taking files and other items out of the
office.  This would have been after 4:35 p.m. when the trial court appointed
Parmelee as receiver.  But Walker also testified that MBS remained responsible
for the property until Parmelee had taken physical possession of the property.

Although
there is some evidence that the property was unsecured during a short period
after the receiver was appointed, the trial court could have reasonably
inferred from Parmelee’s and Walker’s testimony that the damage to the property
resulted from long-term neglect rather than vandalism or other damage occurring
solely on one night after the receiver took over.

Appellant
also cross-examined Parmelee and Walker, as well as Michael Cocanougher, a
representative of one of the loan’s servicers, about whether the lender was
negligent by failing to more closely inspect the property according to its
rights in the loan documents.  The deed of trust gave the lender the right to
physically inspect the property to make sure that it was being maintained
appropriately.  If, upon doing so, the lender determined that corrective
measures were necessary, it could demand that MBS complete those corrections
within ninety days or face default.

The
evidence showed that Parmelee performed two physical inspections in early and
mid-October 2007 when he was investigating whether a receivership was warranted. 
Although he did note numerous problems, he was not able to see the interior of
units, so he did not know the full extent of the damage until he was able to
access the property as receiver.  Parmelee was asked about annual reports the
lender had received from third-party inspection companies; according to
Parmelee, it was hard for him to imagine that a grossly mismanaged property
would receive a good rating from an inspector “[i]f an adequate job of
inspection was being done as written by the inspector.”  He also said that the
reported income from the property was inconsistent with the occupancy level.

Cocanaugher
testified that the lender received property condition inspections in 2004 when
the loan was originated and also in 2005, 2006, and 2007.  The inspectors rated
the property as “good” in 2005, 2006, and November 2007; the property’s rating
in the August 2007 inspection was “fair.”  The 2006 report noted that there was
“major” deferred maintenance that needed to be done at the property, but it
also stated that the property was “in better condition [than] the majority of
the immediate competition.”  Cocanaugher testified that after the lender
received the August 2007 report, it sent MBS a letter pursuant to the deed of
trust demanding that the items listed in the report be fixed, but MBS stopped
making payments in September 2007 and, thus, was already in default by the end
of the ninety-day period for making such repairs.  Cocanaugher further testified
that the November 1, 2007 report was “absolutely” inaccurate, and that the
lender did not accept it and refused to pay for it.

Cocanaugher
and Walker testified that a property manager could manipulate the results of an
inspection by showing the inspector only units that were in good condition.  Property
management knows about the inspections in advance and chooses the units to show
to the inspector.  Parmelee testified that from what he saw when he inspected
the property in October 2007, the reports were not accurate and that he would
have taken issue with them.  According to Walker, although the inspection
reports showed some “deterioration” at the property, it probably looked fine to
the lender based on the photographs attached to the reports.  And although the
reports showed a decline, they did not reflect the true condition of the
property.

Finally,
Cocanaugher testified that although lenders contract for periodic inspections
and collect financial and operating statements from borrowers, a lender cannot
always discern local or regional differences in property performance,
especially if a loan is securitized, as this one was.  According to
Cocanaugher, the lender’s main goal in reviewing these types of reports is to
compare them against what was budgeted at loan origination and try to discern
any “significant meaningful variance.”

We
conclude and hold that there was sufficient evidence from which the trial court
as factfinder could have determined that none of the waste occurring at the
property was attributable to any negligence of appellee, its predecessor, or
both.

          We
overrule appellant’s first issue.

Express
Negligence

          In
his second issue, appellant argues that the express negligence rule does not
apply to relieve appellee of its own negligence.

The
express negligence requirement is a rule of contract interpretation providing
that an agreement purporting to indemnify the indemnitee against liability for
its own negligence must clearly state that intent within the four corners of
the agreement itself.  See Storage & Processors, Inc. v. Reyes, 134
S.W.3d 190, 192 (Tex. 2004); Ethyl Corp. v. Daniel Constr. Co., 725
S.W.2d 705, 708 (Tex. 1987).

          The
indemnity provision here contains no language obligating appellant to indemnify
appellee from its own negligence; instead, the indemnity provision seeks to
have appellant indemnify appellee from any losses appellee incurred for which
MBS was liable under the note.  In effect, the indemnity agreement functioned
as a guarantee that if MBS did not make good on any obligation for which it was
liable under recourse provisions of the note and deed of trust, appellant would
make good on them.  See Nat’l City Mortg. Co. v. Adams, 310 S.W.3d 139,
143–44 (Tex. App.––Fort Worth 2010, no pet.) (op. on reh’g).  Accordingly, the
express negligence rule does not apply here to bar appellee’s recovery pursuant
to the terms of the indemnity agreement because appellee was not seeking
recovery for its own negligence.  See, e.g., MAN GHH Logistics GMBH v.
Emscor, Inc., 858 S.W.2d 41, 43 (Tex. App.––Houston [14th Dist.] 1993, no
writ).  We overrule appellant’s second issue.

Conclusion

          Having
overruled both of appellant’s issues, we affirm the trial court’s judgment.

 

 

 

 

TERRIE LIVINGSTON
CHIEF JUSTICE

 

PANEL: 
LIVINGSTON,
C.J.; GARDNER and WALKER, JJ.

 

DELIVERED:  August 18, 2011









          [1]See Tex. R. App. P. 47.4.





[2]The loan to MBS was placed
into a securitized pool.





[3]Appellee nonsuited Ellen.





[4]The parties submitted the
damage issue to the trial court on a cost-of-repair-and-replacement theory;
appellant has not challenged that measure of damages theory at trial or on
appeal, only whether the evidence submitted supports that theory.  See
Carroll v. Edmondson, 41 S.W.2d 64, 65 (Tex. Comm’n App. 1931, judgm’t
adopted); Frio Invs., Inc. v. 4M-IRC/Rohde, 705 S.W.2d 784, 786
(Tex. App.––San Antonio 1986, writ ref’d n.r.e.); Payne v. Snyder, 661
S.W.2d 134, 141 (Tex. App.––Amarillo 1983, writ ref’d n.r.e.); Wheeler v.
Peterson, 331 S.W.2d 81, 83 (Tex. App.––Fort Worth 1959, writ dism’d).